2014 VT 72

# In re Burlington Airport Permit
# (George A. Maille, Appellant)

[103 A.3d 153]

No. 13-158

Present: Reiber, C.J., Skoglund, Robinson and Crawford, JJ., and Morse, J.
(Ret.), Specially Assigned

Opinion Filed July 25, 2014

*Pamela A. Moreau* and *Damien J. Leonard* of *Murphy Sullivan Kronk*, Burlington, for Appellant.

*William F. Ellis* and *Kevin J. Coyle* of *McNeil, Leddy & Sheahan*, Burlington, for Appellee BTV.

*Amanda S.E. Lafferty* of *Stitzel, Page & Fletcher, P.C.*, Burlington, for Appellee City of South Burlington.

¶ 1. **Skoglund, J.** Airport neighbor, George Maille, appeals the Superior Court, Environmental Division's grant of summary judgment in favor of appellees City of Burlington and City of South Burlington. The court upheld the South Burlington Zoning Administrative Officer's issuance of fifty-four zoning permits to the City of Burlington and Burlington International Airport (BTV) (together, applicants)[1] and concluded that applicants were not required to submit a site plan for zoning board approval. Each permit allows BTV to demolish, remove, and fill in the cellar hole of a vacant structure on BTV-owned property. Neighbor contends that the environmental court erred in concluding that site plan review of the applications was not required under the South Burlington Land Development Regulations (LDR).[2] Although we disagree with part of the environmental court's reasoning, we

---

[1] The City of Burlington owns BTV, but the airport itself is located in the City of South Burlington.

[2] Section 14.01 of the LDR states that site plan review "allow[s] the City of South Burlington to review the arrangement, layout, use interrelationships and neighborhood impacts of sites intended for development or redevelopment and to ensure the aesthetic quality of such design to conform to the character of the neighborhood and the goals of the comprehensive plan." The site plan itself, according to

ultimately affirm its holding that site plan review is not required for the removal of the structures and the placement of fill in the structures' respective cellar holes.

¶ 2. At its heart, the present controversy is about noise — specifically, airport-generated noise and its effects on immediate neighbors. Noise issues in areas surrounding urban airports are not uncommon. See generally L. Zambrano, *Balancing the Rights of Landowners with the Needs of Airports: The Continuing Battle over Noise*, 66 J. Air L. & Com. 445, 446-47 (2000). BTV — located in the midst of residential neighborhoods — generates noise.

¶ 3. As part of its Airport Noise Compatibility Planning required by Federal Aviation Administration (FAA) regulations, BTV has developed Noise Compatibility Programs (NCP), the first of which the FAA approved in 1990. As part of that program, BTV began purchasing residential structures within a certain "noise contour" of the airport to help mitigate the impact of airport-generated noise on BTV's neighbors. Between 1992 and 2007, BTV purchased fifty-nine neighboring homes within a seventy "day-night average" (dnl) noise contour of the airport. In 2008, BTV revised the NCP's noise-level threshold and began acquiring about ten to twenty homes per year within an expanded sixty-five dnl noise contour of the airport. To date, BTV has purchased over 120 homes under the NCP, and has removed sixty-six of those homes without site plan review or conditional use approval by the South Burlington Development Review Board (DRB). Once BTV has acquired a home under the NCP and the sellers have relocated, the home is left vacant and cannot be permanently reoccupied on the current premises for residential purposes. BTV advertises the vacant homes for sale to be moved offsite, but if there are no interested buyers, BTV advertises the homes for deconstruction, salvage, or demolition.

¶ 4. In February 2012, BTV submitted zoning permit applications to the City of South Burlington for the removal of the vacant homes located on each of the fifty-four properties that are the subject of this appeal. Each permit calls for the demolition, deconstruction, or relocation of the vacant home, with foundations demolished to two feet below grade; cellar holes filled; sewer and water lines capped; and turf placed on the former home site. The

§ 14.02, is designed to "show the arrangement, layout, and design of the proposed use of [a property]."

zoning officer issued all of the permits, and neighbor subsequently appealed the decision to the DRB. After holding a public hearing on the appeal, the DRB upheld the zoning officer's determination in a decision issued in June 2012. The DRB held that removing the structures did not constitute a change in the use of the lots. It also held that the LDR did not require site plan review of a proposed vacant lot.

¶ 5. Neighbor appealed the DRB's decision to the environmental court, and all parties filed motions for summary judgment. The court granted summary judgment to neighbor on one issue, finding that BTV's plan to remove the one- and two-family residential dwellings constituted a "change in use" under the LDR. In its ruling the court neither acknowledged nor gave deference to the DRB's ruling that none of the fifty-four zoning applications proposed to change the use of the lot. On all other issues, the court granted summary judgment in favor of applicants. The court held that despite BTV's proposed change of use, site plan review was not triggered under the LDR because the activity on the properties falls under an exception for one- and two-family dwellings. The court also held that site plan review was not triggered by the proposed placement of fill because the activity was incidental to the removal of the structures on those lots and therefore exempt under the LDR. Neighbor now appeals the environmental court's conclusion that no site plan review is required.

¶ 6. This Court reviews the grant of summary judgment de novo, applying the same standard of review as the trial court. *In re Curtis*, 2006 VT 9, ¶ 2, 179 Vt. 620, 896 A.2d 742 (mem.). "Summary judgment is appropriate when, giving the benefit of all reasonable doubts and inferences to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Mooney v. Town of Stowe*, 2008 VT 19, ¶ 5, 183 Vt. 600, 950 A.2d 1198 (mem.).

¶ 7. While the facts in this case are undisputed, the matter of law at issue is the interpretation of a municipal zoning ordinance. When construing a zoning ordinance, we apply the same rules as when construing a statute. *In re Vt. Nat'l Bank*, 157 Vt. 306, 312, 597 A.2d 317, 320 (1991). Thus, "[w]e construe the words of a zoning ordinance according to their plain and ordinary meaning, and the whole of the ordinance is considered in order to try to give effect to every part." *Curtis*, 2006 VT 9, ¶ 2 (quotation omitted). We apply a deferential standard of review to the environ-

mental court's interpretation of a zoning ordinance, and will overturn that court's interpretation "only on a finding of clear error." *In re Toor*, 2012 VT 63, ¶ 9, 192 Vt. 259, 59 A.3d 722.

¶ 8. We first examine the court's determination that the proposed removal of the structures constitutes a change in use. The relevant provision in the LDR, § 14.03(A)(1), states in pertinent part that "[s]ite plan approval shall be required prior to issuance of a zoning permit in all districts, except as provided in subsection B, for: (1) [a]ny new use, change in use, or expansion of use in any district." Section 2.02 of the LDR defines "change of use" as:

> [t]he modification of a use of a building or land, or the replacement of a use of a building or land with another use or uses, or the addition of a use or uses to a building or land, or the *cessation of a use or uses of a building or land.*

(Emphasis added.) Appellant argues that the cessation of the residential use of all fifty-four dwellings is a change in use from residential to nonresidential use. The environmental court agreed. We do not.

¶ 9. ■ ■ In the designated space for "present use" on the permit application, BTV acknowledged the previous residential use of the home and specifically described the present use of the property as "now the site of a vacant house." Under "proposed use," BTV then stated that "[o]nce the building and other improvements are removed from the site, no change in use is presently proposed for this property." Based on this language, the DRB noted in its decision that "[e]ach of the applications for a zoning permit states that the residential use of the structure on the lot has ceased and that the proposal is to remove the vacant one- or two-family structure." The DRB concluded, "none of the 54 applications proposes to change the use of the lot." Because the DRB is the administrative body responsible for executing the LDR, and because we find no clear error in its reasoning, we agree with the Board on this issue. See *In re Duncan*, 155 Vt. 402, 408, 584 A.2d 1140, 1144 (1990) (holding that where an administrative agency's interpretation of its own statute contains no clear error, it is entitled to deference).

¶ 10. Even assuming arguendo that a change of use did occur, the environmental court found that site plan review would not be

required because demolishing or removing the one- and two-family homes is exempt from site plan review under the LDR § 14.03(B). Section 14.03(B) provides: "[s]pecifically excluded from the provisions of this article are: (1) [o]ne-family dwelling on a single lot . . . [and] (2) [t]wo-family dwelling on a single lot." The court reasoned that BTV's purchase of the fifty-four properties did not automatically change their use, even if BTV bought the properties intending to later put them to a new use. It then concluded that the present use of the properties remained one- and two-family dwellings, both of which are permitted in the Residential 4 zoning district where the properties are located.

¶ 11. Neighbor contends that a reading of § 14.03(A) shows the drafters' intent to require site plan approval for BTV's proposal. He argues that the R-4 District is designed to encourage residential use while BTV's purpose in purchasing the lots is to prohibit residential use. He then reasons that the two uses are diametrically opposed. He further argues that any cessation in the residential use constitutes both a change in use and the conversion of a residential use to a nonresidential use.[3]

¶ 12. Neighbor argues that BTV's applications propose a change to an "airport use." Neighbor bases his argument on the LDR' definition of "airport use," which applies to "[f]ixed- and rotary-wing operations together with retail sales and service operations related to public, private, and general aviation, including . . . other uses designed to serve aviation passengers and industry." Relying on the phrase "uses designed to serve aviation passengers and industry," neighbor argues that the new use of the land is essentially a "Noise Lot" designed specifically to bring the airport in compliance with its federally-mandated NCP.[4] Thus, neighbor argues, "the new use of the lots will serve aviation passengers and industry, and . . . constitutes 'airport uses' pursuant to the LDRs."

---

[3] Neighbor points to § 14.03(A)(5), which requires site plan approval for a proposed conversion of a structure from residential to nonresidential, in support of his argument that the drafters did not intend to exempt site plan review for the cessation of a structure's use as a one- or two-family dwelling. We agree with the City of South Burlington that neighbor waived this argument by not raising it at the environmental court. Further, § 14.03(A)(5) is inapplicable because approval of the permits allowing for the destruction of the structures results in no structure to convert.

[4] Neighbor uses the designation "Noise Lot" to indicate a particular use, but points to no source defining that term. Additionally, that designation is not included in the LDR as a defined "airport use."

This Court need not delve into a statutory analysis of "airport use" because we hold that applicants have not proposed a new use — whether classified as "airport," "nonresidential," or otherwise — in the subject applications.

¶ 13. Guided by the enabling statute that grants municipalities the discretion to require site plan approval, the DRB excluded one- and two-family dwellings from site plan review. That statute reads in pertinent part: "[a]s a prerequisite to the approval of any use *other than one- and two-family dwellings*, the approval of site plans by the appropriate municipal panel may be required." 24 V.S.A. § 4416 (emphasis added). The DRB interpreted the language "one- and two-family dwellings" to mean the *construction* of one- and two-family dwellings. The DRB further reasoned, and the environmental court agreed, that the act of construction includes the act of removal, and concluded that "[t]he [LDR] do not require site plan review of the *removal* of a structure, the *construction* and use of which was exempt from site plan review." (Emphasis added.) The DRB found "no other authority in § 14.03(A) of the [LDR] for the Administrative Officer to refer the applications for zoning permits to the [DRB] for site plan review and approval."

¶ 14. ▮▮▮ This Court's role is not to develop an independent interpretation of the municipal regulation "absent compelling indication of error"; rather, this Court will "sustain the interpretation of a statute by the administrative body responsible for its execution." *Duncan*, 155 Vt. at 408, 584 A.2d at 1144 (internal quotation omitted). We agree with the environmental court's conclusion that — even if a change of use occurred — no site plan review is required because of the exemptions present in § 14.03(B).

¶ 15. Further, because applicants do not propose a change in use for the property, neighbor's arguments that site plan review is required because the lots were converted to a "nonresidential use" and an "airport use" are premature. Applicants do not propose any new use for the lots. Applicants have not yet determined a use for the property. The environmental court found that although "BTV has an FAA-approved Airport Master Plan that envisions the future use of the land purchased by BTV under the NCP for purposes compatible with the airport," that plan has not been formally developed beyond the removal of structures and creation of green space as described in the permit applications. As

the court correctly assured, "[w]hen BTV does propose a new use for the subject properties, additional review, possibly including site plan review, will be required."

¶ 16. We cannot determine at this time whether a possible future use will conform with the R-4 District's designated permitted or conditional uses. The definition of "nonconforming use" in the LDR — "[a] use of land that does not conform to the present bylaws" — applies to a specific purpose for which a property is intended. Again, there is no presently-defined use for the properties in this case.

¶ 17. We recognize that this conclusion places these properties in a sort of land-use limbo. Nonetheless, we cannot change the fact that these structures lack any practical utility at present and that the underlying lots are used only as empty space. Because we hold that BTV's application proposed no change in use and thus has not proposed conversion to a nonresidential use or airport use, site plan review is not required under the LDR. When or if BTV wishes to use the properties for anything other than their current nonuse, they will have to submit applications to the DRB that will likely trigger site plan review.

¶ 18. The final issue presented is whether the proposed placement of fill in the cellar holes of each of the fifty-four homes requires site plan review. Section 3.12(A) of the LDR provides that "the placing on land of fill . . . in an amount equal to or greater than twenty (20) cubic yards, except when incidental to or in connection with the construction of a structure on the same lot, shall require the approval of the [DRB]."

¶ 19. As an initial matter, we do not address whether the placement of fill in this case met the LDR requirement of twenty cubic yards or greater because the environmental court found the placement of fill was "incidental" to the construction of the properties and thus exempt from site plan review under § 3.12(A). As this Court defers, in the absence of clear error, to the environmental court's interpretation of a zoning ordinance, we agree with the court's interpretation of § 3.12(A).

¶ 20. The environmental court interpreted the review exemption as having two elements: (1) the placement of fill must occur on a lot on which there is also activity recognized by the LDR as "construction of a structure"; and (2) the placement of fill must be "incidental to or in connection with" the construction of that structure. The court interpreted the phrase "construction of a

structure" as including the removal of a structure because the LDR Definitions section reflects the drafters' intention that the term "broadly encompass such activities." Section 2.02 of the LDR defines "construction" as "[t]he act of adding to, altering, or extending an existing structure or the erection of a new principal or accessory structure on real property." That section further defines "alteration" as "[a]ny act or process that changes one or more of the exterior and interior architectural features or the exit facilities of a structure, including, but not limited to, the erection, construction, reconstruction, or removal of any structure." Accordingly, the court concluded that BTV's proposal to demolish or remove the fifty-four structures is a proposal to alter those homes, which constitutes "construction of . . . structure[s]" pursuant to §§ 2.02 and 3.12 of the LDR.

¶ 21. ▮ ▮ Neighbor argues that this reading of the term construction is "tortured" because the present participle "altering" does not have the same meaning as "alteration." We disagree. "[O]ur interpretation of an ordinance, like a statute, must be based on the intent of the drafters to the extent we can determine it." *Toor*, 2012 VT 63, ¶ 9. The definitions provided with an ordinance offer significant guidance in interpreting the intent of the ordinance drafters. See *id.* ¶¶ 11, 17-19. Additionally, we have relied on the rule of statutory construction that a word used throughout an act or statutes in pari materia "bear[s] the same meaning throughout [the act], unless it is obvious that another meaning was intended." *State v. Welch*, 135 Vt. 316, 321, 376 A.2d 351, 354 (1977). The LDR only provide a definition for the word "alteration"; they do not define any other form of the word, such as alter or altering. However, both words are a form of the verb "to alter." If the drafters intended the present participle "altering" to have a different meaning than the nominalization form "alteration," we presume they would have made that clear with separate definitions for the two forms of the word. Because the drafters did not so express, we agree with the environmental court that the word "altering" has the same meaning as the LDR-defined term "alteration." Thus, under the LDR, removal of a structure is an alteration, which satisfies the "construction of a structure" requirement of the § 3.12(A) exemption.

¶ 22. ▮ The parties do not dispute that if "construction" includes "alteration" and thus "removal of a structure," the second

element of the § 3.12(A) review exemption — that the placement of fill be "incidental to or in connection with" the construction of that structure — is met. All parties agree that BTV's sole purpose in placing fill on the lots is to fill in the cellar holes that were created by the demolition or removal of structures from the lots. Thus, the placement of fill on the lots is clearly in connection with and incidental to the demolition or removal of the structures on each of the lots. As such, we agree with the environmental court that the action is exempt from site plan review under the LDR.

¶ 23. In conclusion, BTV's proposal to demolish or remove the structures on each of the fifty-four lots at issue in this case does not constitute a change in use, and thus does not require site plan review. Additionally, BTV's proposal to place fill into the cellar holes of those structures — an activity that is incidental to the removal of the structures — is exempt from site plan review under the LDR. Although there may be legitimate concern over noise increase without the buffer provided by the former structures, we cannot require site plan review when the LDR do not require it.

*Affirmed.*

¶ 24. **Robinson, J.,** dissenting. I cannot join the majority's holding that acquiring and demolishing fifty-four homes in a residential district to maintain the underlying lots for expressly nonresidential purposes is not a change of use. That conclusion is squarely at odds with the plain language of the South Burlington Land Development Regulations (LDR), as well as the purposes of the regulations, and could have unintended consequences for land use planning in South Burlington and beyond.

¶ 25. Section 2.02 of the South Burlington LDR defines "use" as "[t]he specific purpose or activity for which a structure, building, or land is or may be designed, arranged, designated, or intended or for which a structure, building, or land is or may be occupied and maintained." There is no dispute that the buildings and land in question have been used for one- and two-family residences.

¶ 26. The LDR expressly define a change of use as:

> [t]he modification of a use of a building or land, or the replacement of a use of a building or land with another use or uses, or the addition of a use or uses to a building or land, or *the cessation of a use or uses of a building or land.*

(Emphasis added.) Once BTV acquires and demolishes homes, the lots on which the homes previously were situated cannot be used for residential purposes. That BTV's plans would effectuate a "cessation of a use of a building or land" — namely, cessation of its use for residential purposes — is plain on its face. See *In re Casella Waste Mgmt.*, 2003 VT 49, ¶ 6, 175 Vt. 335, 830 A.2d 60 (stating that if the plain meaning of a zoning ordinance resolves the conflict, there is no need to go further, bearing in mind that the court's role is to give effect to the legislative intent).

¶ 27. The majority suggests that because BTV had not proposed a specific defined new use for the lots other than holding the lots vacant as a sound buffer, the DRB could properly conclude that no change of use is proposed. See *ante*, ¶ 9. If the definition of "change of use" included only the modification, replacement, or addition of a use, this construction might be plausible, albeit dubious. But the definition of "change of use" here expressly includes "the cessation of a use" in addition to modification, replacement or addition of a use. Nobody, including the majority, denies that BTV's demolition of these homes is part and parcel of its plan to cease residential uses on the affected lots. As the Environmental Division rightly concluded, we don't need to know what future use BTV will make of these lots in order to conclude that BTV is ceasing the present use. The majority's reasoning requires that we simply ignore the express statement in the LDR that the cessation of a use is a change of use. See *In re Vt. Nat'l Bank*, 157 Vt. 306, 312, 597 A.2d 317, 320 (1991) (stating that in construing a zoning ordinance, "[w]e consider the whole of the ordinance and try to give effect to every part.").

¶ 28. Moreover, even setting aside that the "cessation of a use" is expressly defined as one type of change of use, the majority's reasoning rests on the notion that open, undeveloped space in a residential district on which residential development is precluded is in a sort of indefinite limbo — a state of land use nothingness. BTV's demolition of the homes and repurposing of the residential lots does not change their use, the majority reasons, because the result of the transformation is no use at all. This reasoning also seems to underlie the majority's affirmation of the Environmental Division's conclusion that demolishing and removing the homes to maintain vacant, nonresidential lots is exempt from site plan review. *Ante*, ¶ 10 (suggesting that notwithstanding the demolition of the homes and the express prohibition of residential develop-

ment on the lots, BTV's proposed use of the fifty-four properties "remained one- and two-family dwellings"). Holding property vacant to serve as a noise buffer is a use, and it's a use that's very different from family homes.

¶ 29. The fact that open, vacant undeveloped space does not easily fit into an existing classification in the City of South Burlington's LDR does not mean that it is not a use. If that were true, one can easily imagine a host of unusual utilizations of property that would be exempt from any land use review because, being undefined in the LDR, their development would not constitute a bona fide change of use.

¶ 30. Nor does the possibility that BTV might at some point in the future seek to use the land for some other specified purpose render its current state a noncognizable limbo. It's always the case that a party seeking to change a property's use might at some point in the future seek to change it further or in another direction. The possibility of future plans and changes of use does not render the proposed immediate use — vacant, undeveloped lots serving as sound barriers between the airport and adjacent residences — mere "limbo" or "nothing." BTV has been clear that that is, and will be indefinitely, the dedicated use of the properties.

¶ 31. If my reading of the plain meaning of the LDR were at odds with the purposes underlying those regulations, I might join the majority in giving the DRB the benefit of the doubt. But the majority's approach squarely undermines the land use planning goals served by the LDR. "[The primary] purpose of zoning is to bring about the orderly physical development of the community." *Vt. Brick & Block, Inc. v. Vill. of Essex Junction*, 135 Vt. 481, 483, 380 A.2d 67, 69 (1977). Demolishing homes and holding space in a residential zoning district for the purpose of preventing residential development can undermine a municipality's land use planning in important ways.

¶ 32. First and foremost, one of the express and important goals of municipal planning is to ensure the availability of safe and affordable housing for all Vermonters. 24 V.S.A. § 4302(c)(11). To that end, municipalities are encouraged to meet the housing needs of diverse social and income groups and to provide for new and rehabilitated housing located conveniently to employment and commercial centers. *Id.* In particular, the Legislature has directed that municipal land use plans "shall include a recommended

program for addressing low and moderate income persons' housing needs as identified by the regional planning commission." *Id.* § 4382(a)(10). The Legislature has further specified that municipal plans shall be based on data and analysis of current trends and the probable social and economic consequences of the proposed plan. *Id.* § 4382(c). These data may include "the existing and projected housing needs by amount, type, and location for all economic groups within the municipality and the region." *Id.* In short, as the Legislature has recognized, focused attention to a community's housing needs is a critical component of any municipal land use plan and associated regulatory scheme.

¶ 33. Consistent with this statutory guidance, the City of South Burlington has created a comprehensive land use regulatory scheme assigning various uses — including commercial, industrial, residential, and park and recreation uses — to a host of specific districts. The regulatory scheme includes more than a half-dozen residential districts dedicated exclusively, or primarily, to residential uses. According to the LDR, the Residential 4 District, in which the properties at issue in this case are located, was formed "to encourage residential use at moderate densities that are compatible with existing neighborhoods and undeveloped land adjacent to those neighborhoods." Removing lots within a designated residential district from residential use, especially on a large scale, has the potential to upset the careful balance among various priorities reflected in the City of South Burlington's LDR.

¶ 34. I am not suggesting that BTV should not be allowed to proceed with its plans to, through demolition of existing residences, develop a noise buffer between the airport and nearby residences. The plan may well comport with the requirements of the LDR and may make a lot of sense. The question before us is only whether BTV's plans — or any other party's similar plans to transition property zoned for a particular use to indefinitely preserved vacant lots — give rise to the kind of change of use that is potentially subject to review. Given the purposes of the land use regulations, as well as their plain language, allowing such large-scale repurposing of lands zoned for residential use to proceed without any review associated with changes of use flies in the face of the purpose of the regulations effectuating the municipality's land use plan.

¶ 35. Although the rule of law embraced by the majority could apply in a range of settings, the potentially disruptive effect of the

DRB's and majority's reasoning is particularly acute in the context of a recognized serious housing shortage in Chittenden County. Pursuant to its authority to gather data concerning the need for housing and to make recommendations to municipalities concerning their plans for meeting housing needs, 24 V.S.A. §§ 4382(a)(10) and 4348a(a)(9), the Chittenden County Regional Planning Commission (CCRPC) has recognized a housing crisis in Chittenden County characterized by limited housing choice and rapidly increasing housing costs as a result of the failure of the supply of housing to keep pace with the housing demand resulting from Chittenden County's expanding economy. See CCRPC, Housing Targets Task Force: Recommended Housing Targets (2004), http://www.ccrpcvt.org/library/housing/recommend_housing_targets_CCRPC_20041122.pdf. In 2004, the CCRPC recommended the addition of 1444 housing units in South Burlington between 2000 and 2010 — requiring growth exceeding South Burlington's historical rate. In this setting, removing a significant chunk of existing housing units from the mix is not nothing — it potentially has substantial implications for the City of South Burlington's ability to meet the community's identified pressing housing needs. And the implications of razing one- and two-family homes to prevent habitation are very different with respect to the City's land use goals than of building those same structures.

¶ 36. The demolition of residential housing units and substitution of indefinitely vacant lots may impact the City of South Burlington's land use planning in other ways. Depending on their quantity and placement, vacant lots can have a significant impact on health, safety and the general welfare of the community — all legitimate concerns of land use planning and regulation. A proliferation of vacant and undeveloped lots can change the character of a neighborhood and depress property values. See, e.g., A. Cooper, *$1 Per Lot for Affordable Housing in Detroit: Non-Monetary Benefits Can Constitute Fair Value in the Sale of City-Owned Surplus Property to Community Development Corporations*, 48 Wayne L. Rev. 1191, 1197 (2002). The rule of law adopted by the majority would allow the unreviewed conversion of properties scattered throughout this medium-density residential district to vacant lots on which residential development is precluded — potentially creating pockets of clustered housing amidst scattered vacant fields.

¶ 37. Again, I do not suggest that a person cannot convert homes in this district to vacant lots on which residential development is precluded; such conversion may be entirely appropriate and consistent with the City of South Burlington's LDR. But the suggestions that this potentially significant conversion of a substantial number of lots in a residential district from residential to vacant does not trigger any sort of review ordinarily associated with changes of use, and that knocking down homes to create vacant lots is functionally the same as building those same homes, are at odds with the goals of the land use regulations.

¶ 38. Although the upshot of the DRB's and majority's analysis of this question may be expedient in this case, the potential ramifications for orderly land use planning in the City of South Burlington, as well as in other Vermont municipalities, are unfortunate. For the above reasons, I respectfully dissent.

¶ 39. I am authorized to state that Justice Morse (Ret.) joins this dissent.