2015 VT 41

## In re Request for Jurisdictional Opinion re: Changes in Physical Structures and Use at Burlington International Airport for F-35A

[117 A.3d 457]

No. 14-192

Present: **Reiber, C.J., Skoglund, Robinson and Eaton, JJ., and Morse, J. (Ret)., Specially Assigned**

Opinion Filed March 6, 2015

*James A. Dumont* of *Law Office of James A. Dumont, PC*, Bristol, for Appellants.

*Geoffrey H. Hand, Brian S. Dunkiel* and *Erik G. Nielsen* of *Dunkiel Saunders Elliott Raubvogel & Hand, PLLC*, Burlington, for Appellee City of Burlington.

*Christopher D. Roy* of *Downs Rachlin Martin PLLC*, Burlington, for Interested Parties Greater Burlington Industrial Corporation and Friends of the Vermont Air Guard, Inc.

¶ 1. **Eaton, J.** In this appeal, we consider whether Act 250 jurisdiction extends to the siting and related construction proposed for the Vermont Air National Guard base at the Burlington International Airport to accommodate the anticipated arrival of eighteen F-35A jets. Following a request for a jurisdictional

opinion, the Environmental Division concluded that there was no Act 250 jurisdiction because the development served no state purpose and there was no material change to any existing permit. The requesting individuals (appellants) appeal that decision, arguing that the proposed changes are development for a state purpose and subject to Act 250 review. Appellants further contend that the project amounts to a substantial change to preexisting development on the Guard base, which requires a permit, and a material change to an existing Act 250 permit, which requires application for an amended permit. We conclude there is no Act 250 jurisdiction, and affirm.

¶ 2. The relevant facts, as presented by the parties on summary judgment, are as follows. Burlington International Airport is owned and operated by the City of Burlington. In 1971, the City received its first Act 250 land-use permit to install and operate an airport hangar and support facilities. The Vermont Air National Guard has a base adjacent to the airport on land leased from the City by the United States Air Force (USAF). The current lease extends through June 2048. The Guard occupies approximately 280 acres of land and maintains forty-four buildings in support of its mission.

¶ 3. Pursuant to directives from Congress and the Secretary of Defense, the USAF is charged with preparing the F-35A for combat. The USAF controls the decision of where to situate the F-35A. As part of its decision, the USAF completed an Environmental Impact Statement (EIS) in September 2013 analyzing the proposed sites. In December 2013, the USAF decided to base eighteen F-35A aircraft at the Vermont Air National Guard base. To house the F-35A requires five internal infrastructure improvements within the existing Guard base: (1) renovating the interior of a building for an F-35A simulator; (2) providing appropriate power in aircraft shelter parking areas; (3) providing secure and classified upgrades to two internal rooms; (4) providing a secure parts-storage area, and (5) making internal design improvements. The Burlington airport runway is used by civilian and commercial aircraft and shared with the Guard and the USAF. A number of Act 250 permits relate to the runway. The proposal does not contemplate any structural changes to the runway.

¶ 4. Appellants requested a jurisdictional opinion from the district environmental coordinator. See 10 V.S.A. § 6007(c) (allowing "any person" to request a jurisdictional opinion from the

district coordinator concerning the applicability of Act 250 to activity that might constitute development). In March 2013, the district coordinator concluded that the construction of the improvements contemplated to accommodate the F-35A was for a federal purpose, and therefore there was no Act 250 jurisdiction over the construction. In addition, the district coordinator concluded that there was no material change to any land-use permits because there were no physical improvements proposed for the runways and the improvements to the Guard base are not governed by an existing permit. To the extent that the operation of the F-35A would increase noise levels, the district coordinator explained that regulation of noise was preempted by the Federal Aviation Act, and therefore was outside the scope of Act 250.

¶ 5. Appellants appealed the denial of jurisdiction to the Environmental Division. Following the City's motion for summary judgment, the trial court concluded that the siting and associated improvements to the Guard base were not development within the meaning of Act 250, and there was no substantial change to the base or material change to an existing Act 250 permit. Thus, the court granted the City summary judgment, and affirmed the decision of the district coordinator. Appellants appealed to this Court.

¶ 6. ■ Summary judgment may be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. V.R.C.P. 56(a). This Court reviews a grant of summary judgment de novo, and applies the same standard as the trial court. *In re Eustance Act 250 Jurisdictional Op.*, 2009 VT 16, ¶ 14, 185 Vt. 447, 970 A.2d 1285. In construing the requirements of Act 250, we aim to implement the Legislature's intent by applying the plain and ordinary meaning of the statutory language. *Id.*

¶ 7. ■ The legal question presented in this appeal is whether Act 250 jurisdiction extends to the construction and related increased noise levels associated with the siting of the F-35A on the Guard base at the Burlington airport. Act 250 is a land-use statute that is intended to regulate and control development so that it will not be unduly detrimental to the environment and orderly growth will be promoted. *In re Spring Brook Farm Found., Inc.*, 164 Vt. 282, 287, 671 A.2d 315, 318 (1995). Act 250 requires a permit prior to commencement of any "development."

10 V.S.A. § 6081(a). The rules implementing the statute also require application for a permit if there is a substantial change to any preexisting development and application for an amended permit if there is a material change to any permitted development. Natural Resources Board, Act 250 Rules, Rule 34(A)-(B), Code of Vt. Rules 12 004 060 [hereinafter NRB Rules].[1]

¶ 8. On appeal, appellants argue three bases for Act 250 jurisdiction: (1) the siting of the F-35A and accompanying retrofit of the Guard base is land development under Act 250 and requires a permit; (2) the construction associated with siting the F-35A involves a substantial change to preexisting development, which requires application for a permit; and (3) the project contemplates material changes to permitted development — namely, the runway — and requires application for an amended permit. We consider each argument in turn.

I.

¶ 9. Appellants argue that the construction required to house the F-35A is development within the meaning of Act 250 and requires a permit. Act 250 defines development in part as "[t]he construction of improvements on a tract of land involving more than 10 acres that is to be used for municipal, county, or State purposes." 10 V.S.A. § 6001(3)(A)(v). The parties agree that the proposal includes the "construction of improvements" on land "involving more than 10 acres." The issue is whether the construction is for "State purposes."

¶ 10. Appellants argue that there is a state purpose to the development and, even if a federal purpose also exists, Act 250 jurisdiction attaches. There are two distinct questions: first, whether the F-35A serves a federal and/or state purpose and, second, if there are both federal and state purposes, whether jurisdiction exists. We conclude that the construction will serve solely a federal purpose and therefore do not reach the second question.

¶ 11. State purpose is defined in the NRB Rules as "the construction of improvements which are undertaken by or for the state, county or municipality *and* which are to be used by the

---

[1] The NRB Rules were amended effective October 2013. Because the jurisdictional opinion was requested in December 2012, the 2009 version of the rules is used in this decision.

state, county, municipality, or members of the general public." NRB Rule 2(C)(15) (emphasis added). We look to the undisputed facts concerning the F-35A to determine whether the construction serves a state purpose. The F-35A program was initiated by the federal government, through directives from both Congress and the Secretary of Defense, and the federal government will finance the project. The federal government completed an Environmental Impact Statement as part of its decisionmaking on where to house the F-35A. The USAF made the decision to base eighteen F-35A aircraft at the Burlington Guard base, which is located on land leased by the federal government. The F-35A aircraft will be used by the Guard for training missions. The stated purpose for the F-35A program is to "efficiently and effectively maintain combat capability and mission readiness as the Air Force faces deployment across a spectrum of conflicts while also providing for homeland defense." The USAF can conceive of no state purpose that the F-35A could be used to attain.

¶ 12. The federal purpose of the project is readily evident. The construction and improvements have been initiated and financed by the federal government. Further, the federal government will use the improvements to further its goal of combat readiness. Therefore, within the meaning of the relevant rule, the federal government has "undertaken" the construction and improvements for housing the F-35A, and the F-35A will be "used by" the federal government. NRB Rule 2(C)(15).

¶ 13. This reasoning is consistent with a 1982 declaratory ruling by the former Environmental Board,[2] which concluded that the improvements needed at the Guard base to house the F-4 fighter jet served a federal purpose. *In re Vt. Air Nat'l Guard*, Declaratory Ruling No. 134 (Vt. Envtl. Bd. July 20, 1982), http://www. nrb.state.vt.us/lup/decisions/1982/dr134-fco.pdf. In that decision, the Board reasoned that there was a federal purpose because the improvements were to be constructed, funded, and owned by the federal government, and located on more than ten acres of land controlled by the federal government.

¶ 14. The question remains, however, whether a state purpose also exists. Appellants point to the fact that under the Federal

[2] The Environmental Board no longer exists, and now the Environmental Division of the superior court has jurisdiction over appeals concerning the scope of Act 250 jurisdiction. 10 V.S.A. § 6007(d)(4).

and Vermont Constitutions, the Guard is under state control unless specifically called to serve federal interests. See U.S. Const. art. I, § 8, cl. 15-16 (according Congress power to call forth, organize, arm, and discipline militia, but reserving to states authority for training militia); Vt. Const. ch. II, § 59 (directing that "inhabitants of this State shall be trained and armed for its defense"); see also *Perpich v. Dep't of Def.*, 496 U.S. 334, 347 (1990) (explaining that state guard units retain status as state actors until called into federal service). Appellants argue that there is a state purpose because the leased land is on the Guard base and the planes will be used by the Guard, which is a state entity. Appellants further assert that because the F-35A is intended to help defend the entire nation, it implements the Vermont constitutional purpose of defending the people of Vermont and therefore has a state purpose.

¶ 15. ▇▇▇ There is no need to resolve any constitutional issue because based on the undisputed facts, we conclude that the proposed construction is not development for "State purposes" within the meaning of the statute and relevant rules. Under the relevant rule, to demonstrate that construction is for a state purpose requires showing that it is both "undertaken by or for the state . . . *and* [is] to be used by the state." NRB Rule 2(C)(15) (emphasis added). The rule's use of the word "and" indicates an intent for the phrases to be conjunctive; therefore it is necessary to comply with both requirements to meet the definition. See 1A N. Singer & J. Singer, Sutherland Statutory Construction § 21:14 (7th ed. 2009) (explaining that use of "and" indicates that elements are conjunctive); cf. *Viskup v. Viskup*, 150 Vt. 208, 211 n.3, 552 A.2d 400, 402 n.3 (1988) (explaining that term "or" in statute should generally be interpreted in disjunctive not conjunctive manner). Here, neither part of the rule is met. The construction does not meet the first requirement in the rule defining state purpose because it was not "undertaken" by the state. NRB Rule 2(C)(15). The state did not instigate the project, and will not fund or control it. In addition, the second prong of the test is not met because the construction is not intended to be "used by" the state. The F-35A is intended to be used to prepare for international missions and homeland defense. The USAF can conceive of no state purpose for the F-35A construction, and the undisputed facts do not contain any information which demon-

strates that the State of Vermont conceives of a state purpose for the construction.

¶ 16. Our conclusion is similar to that reached by the Environmental Board in its decision concerning the F-4.[3] The Board recognized that the Guard serves both the state and the federal government, but concluded that the proposed improvements related to the fighter jet were being made by the federal government and would be under federal control, and therefore there was no state purpose.

¶ 17. Appellants' arguments concerning the nature of the National Guard do not convince us otherwise. Appellants emphasize that the Militia Clauses in the federal constitution give states control over training of the state militia. U.S. Const. art. I, § 8, cl. 16 (providing that "the Authority of training the Militia" is reserved to the states). Appellants assert that because the Guard is a state entity and the Guard members are under state control until called into federal service, the state will be using the F-35A when individual Guard members, acting under state control, pilot the F-35A aircraft during training. See *Perpich*, 496 U.S. at 347 (explaining that state retains control over Guard until called into federal service).

¶ 18. ■ We need not resolve any constitutional question because we conclude that the determination of state purpose under the rule does not depend on the status of the pilots. The NRB Rule defining state purpose focuses on "the construction of improvements," not on the status of individuals who will use the construction. NRB Rule 2(C)(15). The fact that individual Guard members may pilot aircraft during training missions without being called to federal service does not change the fact that the improvements themselves — to house and manage military air-

---

[3] This Court gives deference to the Environmental Board's interpretation of legislation within its area of expertise. See *In re Green Crow Corp.*, 2007 VT 137, ¶ 12, 183 Vt. 33, 944 A.2d 244 (explaining that this Court gives deference to Environmental Board's interpretation of Act 250 "even in appeals raising jurisdictional issues" (quotation omitted)); *In re Southview Assocs.*, 153 Vt. 171, 175-76, 569 A.2d 501, 503 (1989) ("The Board must be afforded deference in its interpretation of its own enabling legislation."). However, this Court reviews de novo the Environmental Division's interpretations of law. See *In re SP Land Co.*, 2011 VT 104, ¶ 13 n.2, 190 Vt. 418, 35 A.3d 1007 (explaining that review of environmental court is just as for any other court, and different than review of agency decision).

craft — have been undertaken by the federal government to be used by the federal government to make troops combat-ready for foreign missions and homeland defense. The use by state Guard members does not alter our conclusion that the project is not for state purposes; the project was not initiated or paid for by the state, it is not located on state-controlled land, and it is not intended for state use.

¶ 19. ■ ■ In addition, the statutory language does not support appellants' argument that because the F-35A will be used in defense of the entire country, it will necessarily be used to defend Vermont and therefore fulfills a state purpose. In construing a statute, we apply the plain and ordinary meaning of statutory terms, and "presume that the Legislature adds and removes statutory language advisedly." *Tarrant v. Dep't of Taxes*, 169 Vt. 189, 196-97, 733 A.2d 733, 739 (1999). We are also mindful that attempting to regulate construction that has a federal purpose would raise constitutional preemption questions, and we avoid construing a statute in a manner that would render it unconstitutional whenever reasonably possible. *Chittenden v. Waterbury Ctr. Cmty. Church, Inc.*, 168 Vt. 478, 487, 726 A.2d 20, 27 (1998). Further, given that the statute conspicuously excludes construction for a federal purpose, we construe the state purpose requirement narrowly. If we applied appellants' reasoning that defense of the nation includes defense of Vermont and amounts to a state purpose, then virtually all federal purposes would also transform into state purposes. This would contravene the intent of the statute, which does not include improvements that serve a federal purpose. We conclude that there is no state purpose to the proposed construction and therefore no "development," which requires a permit.

## II.

¶ 20. Appellants' second argument is that the physical alterations to the buildings on the Guard base required for the F-35A project are a substantial change to preexisting development, requiring application for a permit. Act 250 does not apply to improvements constructed prior to June 1, 1970. 10 V.S.A. § 6081(b); NRB Rule 2(C)(8) (defining preexisting development). However, where there is a substantial change to a preexisting development, a permit is required. 10 V.S.A. § 6081(b); NRB Rule

34(B) (stating that substantial change to preexisting development requires new application process). That is, pre-1970 development is exempted from Act 250 regulation until some change occurs on the property.

¶ 21. ▮ To determine if there is a substantial change involves a two-part inquiry. First, there must be a "cognizable physical change to the preexisting development," and second, the change must have "the potential for significant impact under one or more of the ten Act 250 criteria." *In re Hale Mountain Fish & Game Club, Inc.*, 2007 VT 102, ¶ 4, 182 Vt. 606, 939 A.2d 498 (mem.). Appellants contend that the buildings on the base are preexisting development and the proposed alterations to those buildings to house the F-35A are cognizable changes, which will create increased noise levels and therefore impact three of the Act 250 criteria. See 10 V.S.A. § 6086(a) (listing criteria).[4]

¶ 22. ▮ The first prong of the inquiry is satisfied if there is a cognizable change. A change is cognizable if it involves either a physical change or a change in use. See *In re Vt. RSA Ltd. P'ship*, 2007 VT 23, ¶ 11, 181 Vt. 589, 925 A.2d 1006 (mem.) (affirming finding that installation of antennas and related construction were cognizable changes); *In re Gallagher*, 150 Vt. 50, 52-53, 549 A.2d 637, 639 (1988) (reversing determination that proposal, which did not include physical changes to property, was not cognizable because proposal might nonetheless result in change of use). Appellants argue that there is a physical change in this case that is cognizable, namely the proposed alterations to existing buildings at the Guard base to house the new F-35A.[5]

¶ 23. ▮ ▮ We conclude that this proposed construction is not a cognizable change because it does not amount to development for purposes of Act 250. The NRB Rules define "construction of improvements" as "any physical action on a project site which

---

[4] Appellants allege that the project will impact criterion 1 as air pollution through loud noise, criterion 8 as an impact on aesthetics through noise, and criterion 10 due to nonconformity with the municipal plans because of noise impacts on housing.

[5] Appellants' argument that the construction will create increased noise does not factor into the first part of the analysis; it is relevant only to the second part of the test — whether the change will have the potential for significant impact under one or more of the ten Act 250 criteria. See *Hale Mountain*, 2007 VT 102, ¶ 4 (setting forth two-part test).

initiates development for any purpose enumerated in Rule 2(A)." NRB Rule 2(C)(3). Rule 2(A) refers to both initial development and "any substantial change to a pre-existing development." Therefore, any construction of improvements to preexisting development must itself amount to development under Act 250 for it to trigger the need for a permit. As set forth above, "development" does not include construction that is for a federal purpose. See 10 V.S.A. § 6001(3)(A)(v) (including construction of improvements to be used for state purpose). The physical improvements on the base, which will be subjected to changes under the F-35A plan, are to prepare the base to house federally owned military aircraft and to train persons to use those aircraft. For the same reasons set forth in Section I, we conclude that there is no Act 250 jurisdiction because the proposed construction of improvements serves a federal and not a state purpose and is therefore not development.[6]

### III.

¶ 24. Appellants' final basis for asserting Act 250 jurisdiction is that the project will require a material change to the runway, which has an existing Act 250 permit. Appellants argue that there is a material change to the runway because there will be a substantial increase in noise levels from the use of the F-35A aircraft.

¶ 25. ▉ When permitted development undergoes a material change, a permit amendment is required. NRB Rule 34(A) (explaining that material change to permitted development requires application for permit amendment). The analysis for determining if there is a material change is similar to that used for a substantial change — there must be a cognizable change that will have a significant impact on a finding or condition or may result in significant adverse impact on any of the Act 250 criteria. See NRB Rule 2(C)(6) (defining material change as "any change to a permitted development or subdivision which has a significant

---

[6] On appeal, the City contends that appellants waived any argument that the proposal included substantial changes to the internal buildings on the Guard base because in the Environmental Division appellants only argued that the change in aircraft was a cognizable change. Appellants argue that they adequately raised the issue in both their initial and responsive summary-judgment filings. We need not reach this issue because we conclude that the changes are not development within the meaning of Act 250.

impact on any finding, conclusion, term or condition of the project's permit or which may result in a significant adverse impact with respect to any of the criteria specified in 10 V.S.A. Section 6086(a)(1) through (a)(10)"). Under Environmental Board decisions, a change qualified as cognizable if it was either a physical alteration or a change in use. To determine if such an alteration had taken place, the Board analyzed whether the activity was contemplated as part of the initially approved project. See, e.g., *In re Vt. Inst. of Natural Sci.*, Declaratory Ruling No. 352, slip op. at 26-27 (Vt. Envtl. Bd. Feb. 11, 1999), http://www. nrb.state.vt.us/lup/decisions/1999/dr352-fco.pdf. Both parties have accepted the Board's test for material change and used it in their analysis on appeal. Although this Court has previously adopted the Board's two-pronged substantial-change test, see *In re Vt. RSA Ltd. P'ship*, 2007 VT 23, ¶ 10 (noting that this Court has adopted the Board's substantial-change test), we have not had occasion to consider the material-change test. We now take the opportunity to adopt the Board's articulation of the test for a material change.

¶ 26. Thus, we turn to the question of whether there is a physical change or change in use that qualifies as a cognizable change. The proposal contemplates no physical changes to the runway. Appellants assert that there is a change in use because a different aircraft, the F-35A, will use the runway. Appellants argue that the use of the runway by the F-35A and the concurrent increase in noise levels is not contemplated by the existing Act 250 permits.[7] The environmental court noted that there are several Act 250 permits pertaining to the Burlington airport, but none regulate aircraft operations or aircraft noise. The court concluded that there was no change in use because the

---

[7] Our cases do not delineate which party has the burden of proving that there is a material change to permitted development. Generally, the burden of proving that a project is exempt from Act 250 jurisdiction is on the person claiming the exemption. *In re Vt. RSA Ltd. P'ship*, 2007 VT 23, ¶ 10. We have held, however, that where development is grandfathered in because it was preexisting, the burden is on the proponent of jurisdiction to demonstrate that the project is a substantial change to the preexisting development. *Id.* In this case, appellants argue that the burden was on the City to prove that the existing Act 250 permits covered the changes proposed for the project. We need not reach this issue because we conclude that even if, as appellants assert, the City failed to show that the current permits covered use of the runway by the F-35A, any resulting change in noise levels is preempted by federal law.

existing permits allow aircraft traffic on the runway, and no prior permit precluded a change in aircraft type. We reach the same result as the environmental court — that no permit amendment is required — but on different grounds.

¶ 27. ██ ██ We accept as true appellants' assertion that the F-35A traffic creates noise levels not contemplated by any of the existing Act 250 permits,[8] but conclude that this is not a cognizable change triggering the need for an amended permit because regulation of noise is preempted by federal law.[9] Federal preemption of state and local law can be express, or implied through either field or conflict preemption. *In re Investigation into Regulation of Voice Over Internet Protocol Servs.*, 2013 VT 23, ¶ 14, 193 Vt. 439, 70 A.3d 997 (recognizing three methods of federal preemption). Field preemption occurs when federal control in a field is so pervasive as to displace state authority in that particular area. *Id.*

¶ 28. ██ There is no question that the Federal Aviation Administration has broad authority to regulate air traffic based on noise generation. See *Helicopter Ass'n Int'l, Inc. v. FAA*, 722 F.3d 430, 433-34 (D.D.C. 2013) (holding that FAA has authority to regulate traffic patterns of helicopters based on noise concerns of local residents). The U.S. Supreme Court has recognized that pursuant to federal statute, the FAA and the Environmental Protection Agency (EPA) have full control over the regulation of aircraft noise. *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 633-34 (1973). In *City of Burbank*, the Court considered whether federal law, specifically the Federal Aviation Act, preempted a local ordinance that limited the takeoff hours for certain aircraft for the purpose of limiting the noise effects on surrounding neighborhoods. The Court examined the text of the statute and its legislative history, and concluded that "the pervasive control vested in EPA and in FAA" left no room for local

---

[8] The federal EIS, which both parties accepted at summary judgment, reports that the F-35A will generate higher noise levels than the F-16 aircraft that it is replacing.

[9] The concurrence suggests that a public-nuisance suit could provide an avenue of relief to address the increased noise levels created by the F-35A. Whether such a suit could be brought to address noise created by a federally owned military aircraft is a question that would implicate federal preemption in areas beyond noise regulation. This issue is beyond the scope of this appeal, and as such, we do not address it.

control of noise. *Id.* at 638. In other words, Congress has occupied the entire field of regulation related to aircraft noise, and attempts by local governments to enforce their police powers to control noise or affect flight patterns are preempted. See *Price v. Charter Twp. of Fenton*, 909 F. Supp. 498, 502-03 (E.D. Mich. 1995) (explaining extent of federal preemption and citing cases).

¶ 29. Appellants nonetheless argue that the states can regulate the land-use impacts of airport noise. Appellants point to comments by then-Justice Rehnquist in his dissent in *City of Burbank*, which characterizes the Court's holding as follows:

> A local governing body that owns and operates an airport is certainly *not*, by the Court's opinion, prohibited from permanently closing down its facilities. A local governing body could likewise use its traditional police power to prevent the establishment of a new airport or the expansion of an existing one within its territorial jurisdiction by declining to grant the necessary zoning for such a facility. Even though the local government's decision in each case were motivated entirely because of the noise associated with airports, I do not read the Court's opinion as indicating that such action would be prohibited by the Supremacy Clause merely because the Federal Government has undertaken the responsibility for some aspects of aircraft noise control.

411 U.S. at 653 (Rehnquist, J., dissenting). Based on this language, appellants argue that state and local governments can impose land-use requirements on airport development as long as there is no attempt to directly regulate noise. Appellants contend that here there is room to regulate use of the runway by the F-35A even though this would indirectly regulate noise. Appellants further argue that at the least there is jurisdiction to impose mitigation measures to reduce the impact of the noise.

¶ 30. ■■■ We conclude that any action to regulate a change in use to the F-35A would amount to an attempt to regulate noise and be preempted.[10] We note that Justice Rehnquist's character-

---

[10] Further, any argument that the change in aircraft alone would amount to a cognizable change would also be preempted. The federal government has specifically preempted the states from regulating the type of aircraft that are authorized to use an airport. See 49 U.S.C. § 41713(b) ("Preemption. — (1) Except as

ization of the holding in *City of Burbank* is not binding as it comes from the dissent. However, we agree that *City of Burbank* left some room for some local land-use regulation of airports. See *Goodspeed Airport LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n*, 634 F.3d 206, 210-12 (2d Cir. 2011) (recognizing that Congress intended to occupy the entire field of air safety, but scope of preemption did not extend to state laws on land use). A local entity retains control over land-use regulation, but cannot, "under the pretense of its zoning power, attempt to regulate those flight operations to quell airplane noise." *Price*, 909 F. Supp. at 504; see *Harrison v. Schwartz*, 572 A.2d 528, 534 (Md. 1990) ("A zoning ordinance that does not regulate aircraft noise emissions or the actual conduct of flight operations may withstand a preemption argument."). Indeed, this Court has recognized this distinction, holding that although "the federal government has not pervasively occupied the field of land-use regulations relating to aviation," any attempt to regulate air safety or aircraft noise is preempted by federal law. See *In re Commercial Airfield*, 170 Vt. 595, 597, 752 A.2d 13, 15-16 (2000) (mem.).

¶ 31. Here, the sole cognizable change asserted between the use of the runway under the current Act 250 permit and the use by the F-35A is the increase in noise levels. Since the current permits do not regulate noise, the change asserted by appellants is one that they contend is implicit in the current permit. Necessarily, however, any attempt to now set permit requirements to respond to this "change" is a control aimed at regulating the noise created by the F-35A. Even imposing restrictions to mitigate the effects of noise, such as requiring berms or additional landscaping, would be a regulation of the noise. Such regulation is beyond the scope of Act 250 because it is preempted by federal law. For this reason there is no material change that triggers Act 250 jurisdiction.

*Affirmed.*

¶ 32. **Morse, J.** (Ret.), Specially Assigned, concurring. I concur in the Court's holding insofar as it goes, but write separately to acknowledge what the Court largely disregards — the overpow-

provided in this subsection, a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart.").

ering assault on the senses produced by the F-35A aircraft — and to observe that other remedies may be available to those most immediately affected.

¶ 33. The record evidence of the F-35A's noise impact on the area surrounding the Burlington International Airport is an alarming wake-up call. It reveals that decibel levels of the F-35A on take-off, approach, and landing will be perceived as two to four times louder by the human ear than the current F-16 aircraft. The area experiencing decibel levels incompatible with residential use will increase by several hundred acres, and encompass nearly a thousand additional households. See *In re Burlington Airport Permit*, 2014 VT 72, ¶ 3, 197 Vt. 203, 103 A.3d 153 (discussing the airport's program of acquiring residential structures within a minimum "noise contour" of the airport). Anyone who has experienced the noise generated by an F-16 can only imagine the exponential effect of the F-35A on the local populace.

¶ 34. The Court is correct, nevertheless, that federal law preempts *direct* state and local regulation of noise generated by aircraft in flight. See *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 635 (1973) (invalidating municipal ordinance prohibiting aircraft from taking off from Hollywood-Burbank Airport between 11:00 p.m. and 7:00 a.m., on the ground that Congress had impliedly preempted "the field of noise regulation insofar as it involves controlling the flight of aircraft" (quotation omitted)).

¶ 35. A fair number of courts interpreting *City of Burbank* have also concluded, however, that federal law does *not* preempt common-law actions against municipally-owned airports based on excessive noise or emissions that result in a public nuisance. See, e.g., *Bieneman v. City of Chi.*, 864 F.2d 463, 471 (7th Cir. 1988) (holding that FAA "does not expressly preempt state damage remedies," and rejecting argument that permitting damages while prohibiting regulation was inconsistent); *Greater Westchester Homeowners Ass'n v. City of L.A.*, 603 P.2d 1329, 1336-37 (Cal. 1979) (holding that federal aviation law did not preempt "noise disputes between airport owners . . . and property owners" or provide municipal airport operators "immunity from traditional nuisance liability," and affirming award of damages to homeowners living adjacent to Los Angeles International Airport for personal injuries resulting from aircraft noise); *Owen v. City of Atlanta*, 277 S.E.2d 338, 340-41 (Ga. Ct. App. 1981) (rejecting notion that

"preemption [was] a doctrine behind which an airport proprietor whose facility creates a 'nuisance' may hide," and holding that City of Atlanta, which owns and operates Atlanta International Airport, could be held liable where its "airport invades the property rights of adjacent owners"); *Krueger v. Mitchell*, 332 N.W.2d 733, 739-41 (Wis. 1983) (holding that federal aviation law did not preempt nuisance actions based on "unreasonable noise levels," that such actions would not interfere with "national aviation" policy, and that unreasonable noise may constitute nuisance even if in compliance "with federal and state law"); see generally K. Falzone, Comment, *Airport Noise Pollution: Is There a Solution in Sight?*, 26 B.C. Envtl. Aff. L. Rev. 769, 795 (1999) (observing that courts have reached the "conclusion that claims for personal injuries founded upon nuisance are not federally preempted").

¶ 36. Thus, there is at least an argument to be made that the F-35A will create a "public nuisance" to the area surrounding the Burlington International Airport. Under the common law of this and most states, a "public nuisance" is an activity that represents "an unreasonable interference with a right common to the general public." *State v. Howe Cleaners, Inc.*, 2010 VT 70, ¶ 49, 188 Vt. 303, 9 A.3d 276 (quotation omitted). Here, the right is to be free from the assault of ear-splitting noise generated by jet aircraft.

¶ 37. Of course, whether the facts and law will ultimately support a public-nuisance action by residents of the area near the Burlington International Airport if, and when, the F-35A aircraft is deployed remains to be determined. It is well to recall, however, that the right to a remedy "for all injuries or wrongs which one may receive in person, property or character" is one granted to all Vermonters under our Constitution. Vt. Const. ch. I, art. 4. While a public-nuisance suit may be less than what the affected residents had hoped for, it may at least provide some redress for an injury they are powerless to prevent.