Filed 05/28/25

VERMONT SUPERIOR COURT
Environmental Division
32 Cherry St, 2nd Floor, Suite 303,
Burlington, VT 05401
802-951-1740
www.vermontjudiciary.org



Docket Nos. 23-ENV-00039
23-ENV-00040

| | |
|---|---|
| **Clark CU & AU Appeal** | **MERITS DECISION** |

In this coordinated appeal, Kyle and Katie Clark (the Clarks) appeal two decisions of the Town of Lincoln (Town) Zoning Board of Adjustment (ZBA) related to their request to site a personal aircraft landing area (PLA) at their property located at 432 Orchard Road North, Lincoln, Vermont. In Docket No. 23-ENV-00039, the Clarks appeal a decision of the ZBA denying their application for an accessory use permit for the PLA (the Accessory Use Appeal). In Docket No. 23-ENV-00040, the Clarks appeal a decision by the ZBA denying their application for a conditional use permit for the PLA (the Conditional Use Appeal).

In this matter, the Clarks are represented by Geoffrey H. Hand, Esq. and Malachi T. Brennan, Esq. Neighboring landowner Marilyn Ganahl is represented by Claudine C. Safar, Esq. and Miles M. Stafford, Esq.[1] The Town is represented by Benjamin W. Putnam, Esq. Neighbors Mark and Stephanie Atkins, Sarah Farr, Christine Fraioli, Daniel Guy, Michelle Hall, Sara Laird, Michael O'Connor and Jacqueline Tuxill (together Neighbors) are self-represented. Louella Byrant has also appeared and is self-represented. Barry Olson has appeared "for informational purposes only" and is self-represented.

The Court held a three-day merits hearing on the coordinated appeals on March 17, 18, and 20, 2025 via the WebEx platform. The Court conducted a site visit on April 3, 2025, making observations as requested by the parties. The parties filed post-trial briefs, which were due on April 4, 2025, with replies thereto due April 11, 2025.

---

[1] The Court also has in its records Attorney Brian P. Monaghan as additional counsel for Ms. Ganahl. Attorney Monaghan did not participate at trial with Attorneys Safar and Stafford.

1

## Statement of Questions

In the Accessory Use Appeal, the Clarks raise 6 Questions. They ask:

1. Is a municipal land use permit required for the proposed use under the Town of Lincoln's 2011 Zoning Regulations ("LZR"), which has no provisions or restrictions for Personal Landing Areas?

2. Does the proposed use constitute "Development" under LZR §§ 501 and 800?

3. Is the proposed use recreational use of private property not subject to zoning regulation under 24 V.S.A., Chapter 117, and the LZR?

4. Does the proposed use qualify as an "accessory use" as defined in LZR § 800, as "[a] use or building customarily incidental and subordinate to the principal use or building and located on the same lot."

5. Is review of aircraft operation as an accessory use or other review under the LZR preempted in part by the Federal Aviation Act, 49 U.S.C. § 40101, et seq.?

6. Does the proposed use meet the specific development requirement for an accessory use in the Outlying Zoning District, specified in LZR §§ 330–335.

Accessory Use Appeal Statement of Questions (May 16, 2023).

In the Court's October 18, 2023 Entry Order on the parties cross-motions for partial judgment on the pleadings, the Court answered Accessory Use Question (AU Question) 5 in the affirmative concluding that review of aircraft operation as an accessory use was partially preempted by federal law. See In re Clark CU & AU Appeal, Nos. 23-ENV-00039, 23-ENV-00040, slip op. at 4 (Vt. Super. Ct. Envtl. Div. Oct. 18, 2023) (Walsh, J.) (hereinafter the October 2023 Order). The Clarks have withdrawn AU Question 1.

In the Conditional Use Appeal, the Clarks raise 9 Questions. They ask:

1. Is a municipal land use permit required for the proposed use under the Town of Lincoln's 2011 Zoning Regulations ("LZR"), which has no provisions or restrictions for Personal Landing Areas?

2. Does the proposed use constitute "Development" under LZR §§ 501 and 800?

3. Is the proposed use recreational use of private property not subject to zoning regulation under 24 V.S.A., Chapter 117, and the LZR?

4. Is the LZR ambiguous with respect to whether conditional uses must be specifically listed within a district to be approved as a conditional use?

5. Is the proposed land use allowed as a conditional use in the Outlying District under the LZR?

2

6. Is the LZR ambiguous with respect to the definition of "developed recreational use" listed in LZR § 333.

7. Is the proposed land use "developed recreational use" under LZR § 333?

8. Is review of aircraft operation as a conditional use preempted in whole or in part by the Federal Aviation Act, 49 U.S.C. § 40101, et seq.?

9. Does the proposed use meet the general and specific development criteria for a conditional use in the Outlying Zoning District pursuant to LZR §§ 334, 735 and 736?

Conditional Use Appeal Statement of Questions (May 16, 2023).

In the October 2023 Entry Order, the Court answered Conditional Use Question (CU Question) 8 in the affirmative, concluding that municipal review over the application was partially preempted by federal law, and in the negative, with respect to total preemption. Id. CU Questions 2, 3, 6, and 7 were answered by this Court in a June 6, 2024 Decision on cross-motions for summary judgment. See Clark CU & AU Appeal, Nos. 23-ENV-00039, 23-ENV-00040, slip op. at 8—15 (June 6, 2024) (Walsh, J.). In so doing, we concluded that the proposed use constituted "development" under the LZR, that the proposed use was not the type of recreational use that is exempt from zoning, and that the proposed use was a "developed recreational use" under LZR § 333. In their post-trial brief, the Clarks withdrew CU Question 1.

AU Questions 2 and 3 are identical to CU Questions 2 and 3, which have been resolved. Thus, we interpret both docket's Questions 2 and 3 as resolved. Therefore, the only Questions remaining for the Court's merits review are AU Questions 4 and 6, and CU Questions 4, 5, and 9.

## Findings of Fact

1. The Clarks own the Property, located at 432 Orchard Road North, Lincoln, Vermont. The Property is accessed by Orchard Road North.

2. Orchard Road North becomes an unmaintained Class IV road in the area that runs parallel to the Property and the proposed project site.

3. The Property is approximately 130 acres and contains the Clark's residence.

4. The Clarks propose to site a personal landing area (PLA) for personal aircraft on the Property.

5. The PLA would be located to the south of the Clark's residence and downhill therefrom.

6. The PLA site is within the Outlying Zoning District, as that term is defined by the Lincoln Zoning Regulations (LZR).

7. The PLA site is an existing cleared area that is partially a mown lawn and partially an existing pastured meadow.

3

8. The PLA will be for the Clark's private, recreational use.

9. In the two dockets before the Court, the Clarks propose two alternate scopes of the PLA.

10. In the Accessory Use Appeal, the Clarks propose to site the PLA in the same location and comply with the same setback requirements as the Conditional Use Appeal. The PLA, however, would not involve any grading or earth disturbance (the As-Is PLA).

11. No structures are proposed as a part of the As-Is PLA.

12. The As-Is PLA is effectively an ungraded grassed landing strip.

13. In the Conditional Use Appeal, the Clarks propose to place a PLA that would be a 60-foot by 900-foot graded and grassed landing strip (the Graded PLA).

14. The Graded PLA will serve on average 1 to 2 take offs and 1 to 2 landings per day.

15. The Clarks do not propose to set an upper limit on the number of take offs or landings that may occur per day at the Graded or As-Is PLA.

16. No structures are proposed with the Graded PLA.

17. The Graded PLA will be constructed using cut and fill methods.

18. The finished grade will be one to two or gentler.

19. Limited tree clearing will be required to install the PLA.

20. The PLA is accessed by an existing gravel road that runs along the eastern edge of the existing open meadow.

21. No utility services, such as water or sewer services, are associated with the PLA.

22. No on-site storage of fuel or other material is proposed under either iteration of the PLA, nor will re-fueling activity occur on-site.

23. No lighting, reflective surfaces or signage/display is proposed under either iteration of the PLA.

24. Without consideration to aircraft noise, the PLA will not generate excessive or obnoxious noise, vibration, dust, glare, odors, electrical interference or heat that is detectable at the Property's boundaries.

25. Aircraft temporarily located at the PLA will be tied down on the western end of the PLA and partially screened by trees from view.

26. The PLA was designed by Peter Smiar, an engineer that works in land use permitting.

27. Mr. Smiar has more than 20 years of engineering experience, and in that time he has assisted in projects related to airports at the state and municipal level. He did not specifically design the landing areas at those projects, however.

4

28. The PLA, in either iteration, is designed to blend into the existing landscape, most notably the surrounding meadow and grassed lawn, by remaining a grassed area.

29. The PLA is subject to federal permitting regulations promulgated by the Federal Aviation Administration (FAA).

30. The PLA is subject to state permitting regulations promulgated by the Vermont Transportation Board.

31. Aircraft operations are subject to FAA regulation.

32. In the Conditional Use Appeal, the Court concluded that the Graded PLA is a "developed recreational use" as defined by the LZR. See In re Clark AU & CU Appeals, Nos. 23-ENV-00039, 23-ENV-00040 (Vt. Super. Ct. Envtl. Div. June 6, 2024) (Walsh, J.).

33. Both the As-Is PLA and the Graded PLA are subject to the 2011 iteration of the LZR.

34. The Graded PLA will not impact municipal facilities or services.

35. Access to the Property is from Elder Hill Road, which connects to the Town's center and village area.

36. The Outlying District is largely rural, with residences, various agricultural uses and associated infrastructure, and natural landscapes consisting of forests and fields.

37. The residential uses in the Outlying District are largely low-density, with single-family homes, sometimes with accessory dwellings, on larger lots that are generally separated from neighboring homes.

38. There are no historical resources, such as historical sites, in the area from which one could view the PLA.

39. Adam Crary is an ecologist and wetland scientist employed by VHB with over 15 years of experience assessing natural resources. Mr. Crary conducted a site investigation to identify any wetlands, water resources, wildlife habitat, and natural communities impacted by the PLA.

40. The PLA site contains no mapped wildlife habitat or rare and irreplaceable natural areas. This was confirmed by site investigation completed by Mr. Crary.

41. There are some mapped wildlife habitat resources under the proposed flight path.

42. There are no mapped rare and irreplaceable natural areas under the flight path.

43. The PLA, in both iterations, is a grassed strip of land that is designed to blend into the surrounding landscape, including the existing meadows and grassed lawn.

44. There is additional screening from off-site vantage points by existing forests and trees.

5

45. Michael Buscher, a licensed landscape architect with 25 years of experience, including conducting visual resources and aesthetic impact analysis, conducted a visual and aesthetic impact analysis of the PLA on behalf of the Clarks.

46. The PLA site itself is largely not visible outside of the Property, with the exception of the Class IV road running along the existing meadow.

47. The Property itself is viewable from Elder Hill Road to the north.

48. It is possible to view the PLA site from Lincoln Gap Road to the south and at the intersection of West Hill Road and Browns Road, to the southwest.

49. Views from Lincoln Gap Road will be largely obscured by existing vegetation.

50. The intersection of West Hill and Browns Road is located over a mile away from the Property. Due to the distance and design of the PLA, visibility of the PLA will be limited.

51. None of the Neighbors or Ms. Ganahl live at or near this intersection.

52. Mr. Buscher did not assess the visual impact of planes taking off and landing at the Property.

53. Thomas Hand, a licensed landscape architect hired by Ms. Ganahl, assessed visual/aesthetic impacts from both the PLA and planes taking off and landing therefrom.

54. Like Mr. Buscher, Mr. Hand's analysis of impacts from the PLA alone concluded that views of the PLA would be limited.

55. Views of a plane taking off and landing at the PLA are dependent on factors such as where the viewer is located within Town.

56. Generally, planes taking off from the PLA are anticipated to travel from the west end of the PLA, turning northwest, away from the Town's village center. Planes landing at the PLA are anticipated to follow the same path from the northwest to the west end of the PLA.

57. The flight path is subject to review and approval by federal and state entities and review of the flight path is preempted in this municipal zoning appeal.

58. Assuming an unobscured view, it is estimated that a plane taking off and landing at the PLA will be viewable for approximately 1 minute before it reaches the federally navigable airspace altitude, conservatively estimated to be 1,000 feet above ground level in the present circumstances.

59. From Elder Hill Road, views would be reduced to an estimated 10 to 20 seconds.

60. Existing air traffic in the area has varied over recent years.

61. Prior to approximately 2022, there was limited to no small aircraft flying over the Town.

62. Since 2022, there has been semi-regular instances of low-flying planes in the area, including in the area directly over the Property.

63. There are two other PLAs within the Town.

64. The Rothblatt helipad is within the Outlying District and has been permitted by the Vermont Transportation Board.

65. The Rothblatt helipad received after-the-fact approval from the Town.

66. The Rothblatt helipad is on a residential property.

67. Maule's Roost PLA was permitted in 1980 and has been permitted by the Town.

68. Maule's Roost is on a residential property.

69. Maule's Roost is no longer actively used by its owners. Despite this, it remains permitted and is identified on FAA mapping, along with 4 other PLAs within Addison County.

70. There are no mapped wetlands located at the PLA site and site inspection by Mr. Crary confirmed the lack of wetlands.

71. The PLA is located outside of any buffer of any wetland at the Property.

72. The PLA will not generate any off-site traffic because it is for the Clark's personal use.

73. Construction traffic will be limited to the period of construction, estimated to be 3 months for the Graded PLA.

74. To the extent emergency services need to access the PLA in the event of an emergency, the Court received testimony from Town Fire Chief Dan Ober.

75. The gravel road accessing the PLA is sufficient for emergency vehicles to access the site and this is true in various weather or road conditions.

76. Emergency service vehicles carry sufficient water to address an on-site emergency.

77. Maps indicated that a stream was on-site in the area of the PLA but field investigation by Mr. Crary determined that the stream did not exist.

78. There are no other mapped streams at or near the PLA.

79. The PLA will not inhibit or restrict access to or the use of renewable energy resources for energy generation.

80. The PLA does not require a stormwater permit from the Agency of Natural Resources because no impervious surface is proposed.

81. The Clarks will apply for and obtain a construction stormwater permit from the Agency of Natural Resources for the construction of the Graded PLA.

82. The PLA will not alter existing drainage patterns.

83. The PLA is not in a River or Flood Hazard Area.

Discussion

## I. Preemption

At the close of the Court's merits hearing, the Court requested that the parties, in their post-trial filings, brief the issue of the scope of this Court's jurisdiction over an airstrip, particularly as it relates to whether the Court can consider the impacts of planes taking off and landing at the PLA.

In an October 2023 Entry Order on the parties' cross-motions for partial judgment on the pleadings, the Court addressed preemption generally in this case. See In re Clark CU & AU Appeal, Nos. 23-ENV-00039, 23-ENV-00040, slip op. at 2 (Vt. Super. Ct. Envtl. Div. Oct. 18, 2023) (Walsh, J.) (hereinafter the October 2023 Order). As the Court wrote in our October 2023 Order:

> The Vermont Supreme Court has addressed the Federal Aviation Act's (FAA) preemption of local zoning in In re Request of Jurisdictional Opinion re: Changes in Physical Structures & Use at Burlington Int'l Airport For F-35A (hereinafter F-35A). 2015 VT 41, 198 Vt. 510. In F-35A, the Vermont Supreme Court recognized that "Congress has occupied the entire field of regulations related to aircraft noise, and attempts by local governments to enforce their police powers to control noise or affect flight patterns are preempted." Id. at ¶ 28 (citing Price v. Charter Twp. Of Fenton, 909 F.Supp. 498, 502—03 (E.D.Mich. 1995)). In so concluding, the F-35A Court expressly recognized that "[a] local entity retains control over land-use regulation . . . ." Id. at ¶ 30. This control, however, "cannot, under the pretense of its zoning power, attempt to regulate those flight operations to quell airplane noise." Id. (quoting Price, 909 F.Supp. at 504; Harrison v. Schwartz, 319 Md. 360, 572 A.2d 528, 534 (1990) ("A zoning ordinance that does not regulate aircraft noise emissions or the actual conduct of flight operations may withstand a preemption argument.")). The F-35A Court reiterated that "although 'the federal government has not pervasively occupied the field of land-use regulations relating to aviation,' any attempt to regulate air safety or aircraft noise is preempted by federal law." Id. (quoting In re Commercial Airfield, 170 Vt. 595, 597 (2000) (mem.)).
> Thus, the law is clear. Zoning regulations are partially preempted by the FAA in the area[s] of noise and flight operations.

Id. at 3.

In her post-trial brief, Ms. Ganahl raises a similar argument as presented in her cross-motion for partial judgment on the pleadings. Specifically, she argues that FAA regulations do not preempt the ability of a municipality to decide whether it wants to site a landing strip within its borders. Thus, by extension, when considering whether to site a new landing strip within the municipality, she argues that the reviewing body may consider, but not regulate, matters such as noise, aircraft operations and

8

safety under non-aviation specific zoning regulations. We disagree with Ms. Ganahl's and Neighbors' interpretation of preemption. We now revisit and more fully address the case law that gives rise to the Court's conclusion.

Federal law does not preempt all local zoning as it relates to aviation. See F-35, 2015 VT 41, ¶ 28 (quoting In re Commercial Airfield, 170 Vt. 595, 597 (2000) (mem.). This is a general principal reiterated in nearly all case law cited by both parties. The scope of local zoning, however, must be viewed with consideration of preemption.

For instance, a municipality is not preempted from making specific regulations generally dictating where an airstrip may be sited within its lands, or whether airstrips are allowed within a municipality at all. See Gustafon v. City of Lake Angelus, 76 F.3d 778, 782–90 (6th Cir. Feb. 27, 1996) (concluding that a local ordinance prohibiting seaplane landings on a lake within the municipality was not preempted by federal law); Hoagland v. Town of Clear Lake, Ind., 415 F.3d 693, 696–99 (7th Cir. July 18, 2005) (concluding that a local ordinance prohibiting landing strips and discontinuing all preexisting unapproved landing areas within 5 years was not preempted by federal law); Riggs et al. v. Burson et al., 941 S.W.2d 44, 48–51 (Tenn. 1997) (concluding that a state statute prohibiting heliports within 9 miles of a national park boundary was not preempted by federal law).

The scope of those municipally adopted regulations, however, is subject to preemption. See Blue Sky Entertainment, Inc. et al. v. Town of Gardiner, 711 F.Supp. 678, 690–96 (N.D.N.Y. Apr. 18, 1989). In Blue Sky, the District Court analyzed a local ordinance that regulated small airports and parachute jumping centers. The ordinance has multiple requirements. It required that those facilities have licenses and comply with federal/state/county rules, have sufficient sanitation, carry liability insurance in specific amounts and terms, prohibited camping on airport property, and prohibited the sale and possession of alcohol or controlled substances. Id. at 681–82. Parachuting centers were required to log jumps, and the ordinance set certain restrictions on where, when and how jumps may occur. Id. at 682. The ordinance also sought to regulate low-flying aircraft by setting flight patterns, and attempted to regulate noise by dictating what aircraft could use the facilities. Lastly, the ordinance set certain monitoring procedures and bond requirements for noise complaints. Id. The Blue Sky court concluded that the portions of the law seeking to regulate the act of parachute jumping, flight patterns, noise, and requiring descriptions of aircraft that would use the facility were all preempted by federal law and were therefore void. Id. at 690–96.

Even when there is not a specific zoning regulation targeting airports, case law indicates that general conditional use review standards may not be used to regulate a preempted topic. For instance,

9

in Harrison v. Schwartz, the Maryland Court of Appeals, now called the Maryland Supreme Court, concluded that two conditions placed on a conditional use permit for a privately owned airport were preempted by federal law. 319 Md. 360, 374–75 (1990). Specifically preempted were the conditions regulating aircraft noise by limiting the hours of takeoffs and the intervals between take offs. Id.

Thus, read together, municipalities are preempted from regulating issues of noise, aircraft safety, and operations. Despite this, municipalities retain some zoning review over airports and landing areas. A municipality may choose to enact regulations prohibiting airports or landing areas or limiting them to certain locations. Even so, should a municipality allow airports in some capacity, it may not regulate them in a preempted topic, either by specific regulatory provisions or through permit conditions.

This brings the Court to the present circumstances. The Town does not prohibit airports or regulate them as an independent land use. As such, we are left to apply the typical conditional use and accessory use standards to the landing areas.

Ms. Ganahl argues that because municipalities generally have the power to prohibit airports and landing areas, we can consider preempted topics and decide to deny the application.[2] It may be true that some prohibitions or district-based limitations on airports may be motivated by noise impacts or other preempted topics. In the absence of such a general prohibition in the LZR, however, the Court cannot deny a permit application on preempted grounds. As the Vermont Supreme Court has recognized, "a local entity retains control over land-use regulation, but cannot, 'under the pretense of its zoning power, attempt to regulate those flight operations'" to regulate a preempted topic. F-35, 2015 VT 41, ¶ 30 (quoting Price v. Charter Twp. Of Fenton, 909 F.Supp. 498, 502–03 (E.D.Mich. 1995); citing Harrison, 319 Md. 360, 371–72 (1990)); see also In re Comm. Airfield, 170 Vt. 595, 597 (2000). Therefore, we reach the same conclusion that we did in October 2023—the LZR as applied to the applications before the Court is preempted in the areas of noise and aircraft safety. We will apply the LZR to avoid preempted topics and regulation thereof.

In reaching this conclusion, we note that visual impacts from planes in the viewshed is not a preempted topic. While the Court lacks the ability to regulate aircraft operations, the visual impacts of planes taking off and landing at the Property, without consideration of the noise associated with

---

[2] This assertion would effectively create proxy regulation of preempted topics. This is not a general consideration of the land use impacts that airports or landing strips may have that would guide a municipality to enact a regulation prohibiting or limiting the siting of landing areas within it. It is instead requesting specific consideration of preempted topics related to the specific proposal before the Court under the relevant regulations.

that process or aircraft safety considerations, are relevant to the Court's analysis under the applicable regulations. The Court received substantial evidence on this issue at trial. The Court excluded evidence related to noise and aircraft safety. The visual impacts from take-offs and landings at the Property are relevant to our review of the conditional use and accessory use criteria under the LZR, most notably the Court's analysis of the character of the area.[3]

## II.  CU Questions 4 and 5

CU Questions 4 and 5 were not explicitly resolved by pre-trial decisions in this matter. They were, however, functionally adjudicated by the Court's June 6, 2024 decision. This is because the Court concluded that the Graded PLA could be reviewed as a "developed recreational use" which is a conditional use within the Outlying District. See Clark AU & CU Appeal, Nos. 23-ENV-00039, 23-ENV-00040, slip op. at 14—15 (June 6, 2024) (Walsh, J.). By reaching that conclusion we implicitly answered CU Question 4 in the negative, concluding that the LZR was not ambiguous as to whether conditional uses must be specifically listed in the district as a conditional use and CU Question 5 in the affirmative, concluding that the proposed land use may be reviewed as a "developed recreational use" in the district. We do not analyze these Questions again here.

## III.  CU Question 9

In the Conditional Use Appeal the sole Question remaining is CU Question 9, which asks whether the Graded PLA meets the relevant development criteria for conditional uses within the Outlying District.

### a.  General Conditional Use Criteria

LZR § 735 sets forth the general conditional use review criteria. It requires that a development or use will not result in an undue adverse impact on: (1) capacity of community facilities; (2) the character of the area; (3) offsite traffic impacts; (4) compliance with the LZR, and; (5) renewable energy resources. LZR § 735(1)–(5).

With respect to community facilities, the Graded PLA will not require any new utility services or generate an impact on community facilities, such as schools. To the extent that the Graded PLA may be served by emergency services, the Court discusses that issue with respect to LZR § 736(12)

---

[3] In their post-trial briefing the Clarks address what elevation from the ground would constitute "federally navigable airspace." In some instances, they assert it begins 1,000 feet from the ground, but in others, which they assert are more relevant here, it begins 500 feet from the ground. Neighbors and Ms. Ganahl do not address this issue in briefing. Mr. Hand, Ms. Ganahl's witness, used 1,000 feet to place his analysis into context. The parties appear to not dispute that planes flying in federal airspace are out of the reach of this Court's jurisdiction. Even if the Court adopts the 500-foot limit offered by the Clarks, the Court can still consider non-preempted visual impacts of take offs and landings at the Property. Because Mr. Hand's used 1,000 feet in his analysis and testimony, the Court uses this more liberal figure.

and concludes that the facility will not have an undue adverse impact on municipal emergency services. The Graded PLA will not generate any off-site traffic on municipal roadways. Thus, we conclude that the Graded PLA complies with LZR § 735(1). Further, for the same reason, we conclude that the Graded PLA complies with § 735(3).

Additionally, for the reasons set forth herein, ,the Graded PLA complies with, LZR § 735(4), which requires the project's overall compliance with the bylaws and regulations in effect.

Further, the Graded PLA, which consists of a graded, grassed strip on the Property, does not restrict or inhibit renewable energy resources. Thus, the Graded PLA complies with LZR § 735(5).

The bulk of the parties' dispute and evidence at trial concerned LZR § 735(2), the Graded PLA's impact on the character of the area. LZR § 735(2) states that:

> The character of the area affected [is] defined by the purpose or purposes of the zoning district within which the project is located, and specifically stated policies and standards of the municipal plan. A conditional use may not, by its nature, scale, or conduct cause an undue adverse change to the character of the area, as the area would exist if fully developed in accordance with the municipal plan.

The purpose of the Outlying District is as follows:

> To continue the Town's present settlement pattern of a compact population center surrounded by a rural countryside; to encourage the sighting [sic] of development so as to maintain open land and to blend structures into the natural surroundings; to maintain scenic views; to reserve agricultural and forestland for production; to enhance ease of access by encouraging development in this district to cluster, and to protect wetlands, water resources and wildlife habitat areas.

It is largely undisputed that the Graded PLA, which is a graded, grassed strip of land, will not be visible off-site. Exceptions to this include a few viewing locations such as on the Class IV road immediately adjacent to the Clarks' land. Additionally, the PLA may be viewable from Lincoln Gap Road to the south, though views therefrom will be largely obscured by existing vegetation. Additionally, the PLA may be viewable from the intersection of West Hill Road and Browns Road to the southwest, though due to the distance between locations, visibility of the PLA will be limited. Further, to the extent it is visible, the Graded PLA alone is simply a graded grassed strip of land. It is undisputed that the physical land development associated with the Graded PLA does not have an undue adverse impact on the character of the area and the Court concludes as such.

The bulk of the parties' dispute on the Graded PLA's compliance with LZR § 735(2) relates to the act of planes taking off and landing at the Property and the impacts therefrom. For the reasons

explained above, aspects of aircraft operations, including noise and safety, are preempted by federal law. The Court will therefore not consider these topics when analyzing the Graded PLA's compliance with LZR § 735(2). Visual impacts from planes taking off and landing over the viewshed, without consideration for noise, safety or flight operations, is not preempted by federal law and the Court will analyze those visual impacts under § 735(2).

When analyzing the character of the area for zoning purposes, we analyze both the character of the area as defined by the district in which the proposed development is located, and the specifically stated policies and/or standards in the municipal plan and also the existing uses in the area. See In re Hettinger Conditional Use & Act 250 Approvals, Nos. 130-11-18 Vtec, 44-3-19 Vtec, slip op. at 9 (Vt. Super. Ct. Envtl. Div. Nov. 20, 2019) (Walsh), J.) (citing In re Willowell Found. CU, No. 142-10-12 Vtec, slip op. at 3, 22 (Vt. Super. Ct. Envtl. Div. July 10, 2014) (Walsh, J.) *aff'd* 2016 VT 12).

When analyzing whether a project has an undue adverse effect on the character of the area, we use a modified version of the so-called "Quechee" test. See Re: Quechee Lakes Corp., Nos. 3W0411-EB, 3W0439-EB, Findings of Fact, Conclusions of Law and Order at 19—20 (Vt. Envtl. Bd. Nov. 4, 1985) (explaining the former Environmental Board's two-step process for determining whether a project has an undue adverse effect on aesthetics under Act 250 Criterion 8); see also In re Grp. Five Invs. CU Permit, 2014 VT 14, ¶ 14, 195 Vt. 625 (upholding our use of the two-part Quechee test to analyze undue adverse effect on specific characteristics within a town's zoning ordinance, including character of the area), *overruled on other grounds* 2017 VT 112.

When conducting a Quechee analysis, first the Court considers whether the project would cause an adverse effect on the characteristic in question, here visual aesthetics. See Quechee Lakes Corp., Nos. 3W0411-EB and 3W0439-EB, at 19. If not, our analysis ends. If it would cause an adverse effect, then the Court asks whether the effect would be undue. Id.

To determine whether a project will have an "adverse" impact, the Court looks at how the project fits within the context of its area in terms of size, scale, nature of use, and various off-site impacts. Id.; See also In re Free Heel, Inc., No. 217-9-06 Vtec, slip op. at 5 (Vt. Envtl. Ct. Mar. 21, 2007). If a project fits within its context, it will not have an "adverse" aesthetic impact.

The Clarks' applications do not limit the number of daily aircraft take offs or landings at the Property. The entirety of their evidence is presented with the assumption that there would be an "average" of 1 to 2 daily take offs and 1 or 2 landings a day. This was reiterated by the Clark's expert

13

witnesses and is presented in their post-trial briefing.[4] The term "average" is an ambiguous term that inherently implies that some days the number of flights may exceed two and some days the number of flights may be less than two. Evidence was not offered regarding potential impacts of more than 2 daily take offs and 2 daily landings. We review the application with that in mind.

Aircraft presently fly over the general area of the Property and the Outlying District and have done so on a semi-regular basis since approximately 2022.[5] While there are two other PLAs in the area, one has been inactive for many years and the other, while in the same zoning district, is not located in the immediate area of the Property. Aircraft do not presently take off or land at the Property. Even two take offs and landings will be a new use in the area and a new visual component of the character of the area. The Court concludes that the view of planes flying through the viewshed of the Property's area and Elder Hill Road neighborhood while taking off and landing is adverse as it is a new activity that does not fit the area.

Next, we turn to whether the impact will be "undue." An impact is undue if: (1) it violates clear, written community standards intended to preserve aesthetics or scenic natural beauty of the area; (2) it offends the sensibilities of the average person; or (3) the applicant has failed to take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings. Lathrop, 2015 VT 49, ¶ 74 (quotation omitted).

When determining if there is a clear written community standard, we generally look to town plans. See McLean Enters. Corp., No. 2S1147-1-EB, Findings of Fact, Conclusions of Law, and Order, at 55 (Vt. Envtl. Bd. Nov. 24, 2004). Statements signaling a dominant policy within a town plan are sufficiently clear. Id. at 56.

---

[4] For example, in their post-trial brief relative to § 735(2), the Clarks write that "[t]he only remaining question is whether the limited, one or two average daily takeoffs and landings[,] would result in an undue adverse impact on the character of the area." Clark Post-Trial Brief at p. 25.

[5] The parties dispute who is flying these aircraft and whether it is Mr. Clark or his associates. Some of the flights are attributable to Mr. Clark. The Court understands that Neighbors and Ms. Ganahl do not appreciate these flights and contend that they are attributable to Mr. Clark. They argue that, because the flights may, in whole or in part, be attributable to Mr. Clark, as an applicant, we cannot consider them when conducting our character of the area analysis. The Court disagrees. These flights have been occurring in some capacity for approximately 3 years. Even if this Court were to deny the application, these flights are not a part of this application and these flights could continue subject to federal regulations. This is true no matter who is piloting the aircraft. Thus, the Court will consider flights that do not take off from or land at the Property as part of the character of the area analysis.

For the same reason, the Court declines to specifically consider certain aeronautics depicted in Ms. Ganahl's Exhibit M. While Ms. Ganahl argues that the depiction is indicative of what types of flying the Clarks will do when taking off from the PLA, this Court lacks the ability to regulate such flight activities and, in any event, it appears undisputed that the flight depicted did not take off from the Clark's property. Thus, the flight depicted in Exhibit M is relevant to existing flight traffic in the area, but not necessarily relevant to the flights that would occur from the PLA. To the extent it is, consideration thereof is preempted.

The Town Plan identifies areas of Elder Hill and West Hill Road as being scenic viewsheds. See Ex. A at 26. Nothing within the Town Plan, however, states a dominant policy that is applicable to the Project. The "Landscape" section of the plan states that the Town "desires to protect" all viewsheds in the Town and that identified viewsheds "deserve protection." Id. It then lists goals related to the protection of canopied roadways in Town that, even if relevant to viewsheds generally, lack language sufficient for the Court to apply as a clear, written community standard. The sole potentially relevant language is the listed "goal" to "protect and enhance the town's landscapes and viewsheds." Id. at 27. The Court concludes that this generalized "goal" is by its nature not a dominant policy within the Town. Thus, we conclude that the Project does not violate a clear, written community standard.

Next, we look at whether the visual impacts of the project would offend the sensibilities of an average person. The Court's analysis in this regard is not whether the parties opposing a project will be shocked by it, but whether the average person would be. See Goddard College, Nos. 175-12-11 Vtec, 173-12-12 Vtec, slip op. at 14 (Jan. 6, 2014) (Walsh, J.). The relevant inquiry "includes whether the [p]roject would be so out of character with its surroundings or so significantly diminish the scenic qualities of the areas to be offensive or shocking to the average person." Re: Times & Seasons, No. 3W0839-2-EB, at 49 (Nov. 4, 2005).

As set forth above, the Clarks' evidence in support of their application is based on an "average" of 2 take offs and 2 landings per day. The Clark's application does not include language limiting the number of take offs and landings relative to the use of the Graded PLA. The Clarks have presented no evidence of visual impacts beyond 2 take offs and 2 landings per day. The Clarks bear a burden of production to support their application. See In re Ranney Dairy Farm, LLC Major Subdivision Appeal, 2024 VT 66, ¶ 12 (citations omitted). Without evidence of visual impacts beyond 2 take offs and 2 landings per day, the Court is unable to conclude that the application would not be shocking and offensive to the average person if more than 2 take offs and 2 landings occur. The Clarks have therefore failed to meet their burden of producing sufficient evidence for the Court to conclude that the Graded PLA will not be shocking or offensive to the average person beyond 2 take offs and 2 landing per day.

The application before the Court is for a potentially unknown and/or unlimited number of take offs and landings that could occur per day at the Graded PLA. This could potentially result in multiple and constant visual impacts where no such undue impacts presently exist. Thus, to the extent that the Clarks request more than 2 take offs and 2 landings per day from the Graded PLA, we

15

conclude that the Clarks have not met their burden of producing sufficient evidence for the Court to rule upon this prong of the analysis.[6] Considering the evidence before the Court, we conclude that a maximum of 2 take offs and 2 landings per day will not be shocking or offensive to the average person.

Finally, we look at whether the applicant has taken generally available mitigating steps to improve the harmony of the proposed project with the surrounding area. Neighbors and Ms. Ganahl do not provide examples of reasonable mitigation that the Clarks could undertake to lessen visual impacts from the Graded PLA. To the extent that they assert that no mitigation is possible and the use should not exist, that is not reasonable mitigation. See In re Vt. Elec. Power Co., No. 7C0565-EB, Findings of Fact, Conclusions of Law, and Order at 4—5 (Vt. Envtl. Bd. Dec. 12, 1984); see also In re Zaremba CU-Jericho, No. 101-7-13 Vtec, slip op. at 14 (Vt. Super. Ct. Envtl. Div. Nov. 7, 2014) (Walsh, J.). The Clarks have not proposed any mitigation to address the visual impacts from the Graded PLA. Throughout trial, all of the Clark's evidence presented was based upon an understanding that "on average" there would be one to two take offs and one to two landings per day. The Clarks have declined to affirmatively adopt this average as a self-imposed mitigation measure.

By failing to take the reasonable mitigation of limiting take offs and landings to what they assert will be the average use of 2 take offs and 2 landings per day, the Court concludes that the Graded PLA's aesthetic impacts will be adverse and, absent a condition, those impacts will be "undue" under the Quechee test. To satisfy the Quechee test and ensure that the Graded PLA will not have an undue adverse impact on the character of the area, the Court imposes a condition limiting take offs and landings at the Graded PLA to 2 take offs and 2 landings per day. With this condition, unduly adverse aesthetic impacts from take offs and landings will be mitigated.

The Court concludes that viewing planes taking off or landing at most twice per day is not shocking or offensive to the average person. While the Court understands that this is a new aspect of the viewshed, taking off and landing is a relatively short process and, once the plane reaches federally navigable airspace, it is beyond the reach of this Court's jurisdiction. Further, a person's view of a plane taking off and landing will vary in both scope and duration based upon where they are located in relation to the plane. It is estimated that, depending on where located, a person may be able to see a plane for as short as 10 to 20 seconds from Elder Hill Road to as long as a minute with an unobscured

---

[6] It would further appear evident that unlimited take offs and landings at the Graded PLA would be shocking given the context of the area. Given the fact that the record is devoid of evidence of impacts beyond an "average" of 2 take offs and 2 landings per day, the Court can not reach a positive conclusion on this issue.

view. Assuming that there are two take offs and two landings per day, by Ms. Ganahl's expert's assumptions, that is less than 5 minutes of visual impacts from a plane per day. Even with consideration to the overall rural nature of the Town and area surrounding the Property, this is a relatively minor amount of time to be impacted by the Graded PLA. Again, we emphasize that any noise impacts are outside the scope of this Court's jurisdiction. Thus, the Court concludes that the visual impact of viewing planes taking off or landing at most twice per day is not shocking or offensive to an average person.

Thus, we conclude that the Graded PLA will comply with LZR § 735(2) as conditioned with a maximum of 2 take off and 2 landing per day.[7] But for the condition limiting take offs and landings, we conclude that the Clarks have failed to meet their burden of demonstrating that the Graded PLA, with unlimited take offs and landings, would comply with LZA § 735(2).

**b. Specific Conditional Use Criteria**

LZR § 736 sets forth sixteen additional standards that the ZBA and this Court on appeal may consider and "make such additional requirements as it deems necessary" for a project. The standards include: (1) onsite vehicular safety; (2) adequacy of landscaping, screening or setbacks; (3) building design; (4) freedom from flooding and ponding; (5) exterior lighting; (6) grading; (7) size, location and design of signs; (8) impacts to adjoining uses; (9) outside displays; (10) storage of goods; (11) sufficient water and sewage; (12) fire, explosive, or other safety hazards; (13) effect on visual, natural, and historic assets to the community; (14) hours of operation; (15) other factors, and; (16) other specific standards for special uses. LZR § 736(1)–(15).

First, the Graded PLA does not propose any new buildings, lighting, signs, displays, storage of goods, or water or sewer service. The Graded PLA use does not implicate other specific standards. Thus, § 736(3), (5), (7), (9) through (11) and (16) are irrelevant. Section 736(14) refers to hours of operation for "enterprises." The use here is recreational and is related to the Clark's residential use of the Property such that subsection (14) is irrelevant. Finally, the parties have not identified other factors beyond what is considered within § 736 such that § 736(15) is irrelevant. This leaves § 736(1), (2), (4), (6), (8), (12), and (13) for the Court's review.

The Graded PLA will not generate traffic. To the extent that emergency services are needed to access the PLA, there is a gravel road providing access to the site. Evidence presented at trial

---

[7] While no party has asserted that temporary construction noise associated with the Graded PLA will be an undue adverse impact on the character of the area, to the extent that the Court must consider it, we conclude that it will not be an undue adverse impact. This is because it is a temporary, approximate 3-month construction-phase limited impact will not be adverse or undue.

demonstrates that this road is sufficient for such emergency services. Thus, the Graded PLA complies with § 736(1).

LZR § 736(2) addresses the adequacy of landscaping, screening, or setbacks. The PLA complies with the relevant setback[s]. Section 736(2) also relates to Viewshed Overlay Criteria, set forth in LZR §§ 410–13. LZR § 411 notes that the Viewshed Overlay Area addresses the siting of "houses or other structures" and sets forth non-mandatory criteria to guide such siting. The Graded PLA does not propose any structures. To the extent that the Viewshed Overlay criteria remain relevant to the Graded PLA despite the lack of structures, it meets the guidelines. The Graded PLA is located in an existing meadow and will be grassed to blend into that space. Clearing required to install the Graded PLA is minor. No lighting or reflective materials are proposed to be installed. It is generally undisputed that the Graded PLA itself is largely not visible off-site and, to the extent it is, it is a grassed and graded strip of land. The Court concludes that the Project complies with the Viewshed Overlay criteria. Finally, § 736(2) addresses landscaping features designed to mitigate impacts from the use. The Graded PLA is designed to blend into the existing meadow by remaining a grassed strip. We conclude that the Graded PLA complies with § 736(2).

The Graded PLA will not alter drainage patterns. Further, the project does not require a stormwater permit because it will not create impervious surfaces. The project will require a construction stormwater permit, which the Clarks must obtain and comply with prior to commencing any construction. With this, the Court concludes that the Graded PLA complies with § 736(4).

The grading proposed for the Graded PLA will not result in slopes of greater than one-to-two. Thus, the Graded PLA complies with § 736(6).

Section 736(8) addresses impacts on adjoining uses from "obnoxious or excessive noise, smoke, vibration, dust, glare, odors, electrical interference or heat that is detectable at the boundaries of the lot." LZR § 736(8). Except for aircraft noise, which is preempted, the Graded PLA will not generate these identified impacts.[8] The Graded PLA therefore complies with LZR § 736(8).

Section 736(12) addresses fires, explosives, or other safety hazards. The Clarks do not propose to store fuel or to fuel planes at the Property. Nor do they propose to store other hazardous materials. The Town's Fire Chief testified that the fire department would be able to provide emergency services to the Graded PLA in the event of an emergency. Neighbors and Ms. Ganahl did not provide evidence

---

[8] To the extent the Court considers impacts from construction, there is no allegation or evidence that construction noise will be obnoxious or excessive at the Property's boundaries.

to countervail Chief Ober's testimony beyond general concerns with safety. We conclude that the Graded PLA complies with LZR § 736(12).

Finally, LZR § 736(13) addresses the effect on visual, natural, and historic assets of the community. This subsection asks the Court to "determine, where applicable, that the proposed project will not have an undue adverse effect on the scenic or natural beauty of the area, aesthetics, or historic sites; or important wildlife habitat or rare or irreplaceable natural areas identified in the Town Plan or State law." For the same reasons as set forth with LZR § 735(2), as conditioned, the Graded PLA will not have an undue adverse visual or aesthetic impact. There are no historic sites visible from the Graded PLA. There are no mapped important wildlife habitats or rare or irreplaceable natural areas at the Property. To the extent that impacts from flights are considered, there are limited mapped wildlife habitats under the Clark's proposed flight path and there are no mapped rare and irreplaceable natural areas. Thus, we conclude that the Graded PLA as conditioned complies with LZR § 736(13).

For the foregoing reasons, the Court concludes that, as conditioned, the Graded PLA meets the general and specific conditional use standards set forth in LZR §§ 735, 736.

## IV. AU Questions 4 and 6

Turning to the Accessory Use Appeal, only AU Questions 4 and 6 remain. They address whether the As-Is PLA qualifies as an "accessory use" as defined by LZR § 800 and, if so, does it meet specific development requirements set forth in LZR §§ 330–335.

Accessory uses are permitted in the Outlying District. LZR § 332. An "accessory use" is defined as:

> A use or building customarily incidental and subordinate to the principal use or building and located on the same lot. For residential uses these include, but may not be limited to garages, garden and tool sheds, playhouses, and in-ground swimming pools or other structures that are incidental to the residential use or the premises and not operated as a commercial enterprise.

LZR § 800 ("Accessory Use or Building).

The As-Is PLA is not commercial in nature and is proposed as a recreational use. Thus, the Court's analysis turns to whether the use is "customarily incidental and subordinate to" the residential use of the Property.

The As-Is PLA is a recreational use associated with the Clark's residential use of their home. It makes no physical alterations to the Property. It is therefore subordinate to the principal residential use of the Property.

19

Next, we turn to whether the use is "customarily incidental" to the residential use. The parties point us to two cases, neither of which completely resolve the issue of whether a use like the As-Is PLA could be "customarily incidental" to a residential use. The Paul Valois case, cited by Ms. Ganahl, addresses whether a landing strip that "does not meet the standards for VTrans approval" was "customarily incidental" to the principal residential use. In re Paul Valois – Private Landing Strip, No. 7-1-06 Vtec, slip op. at 6 (Vt. Envtl. Ct. May 5, 2007) (Wright, J.). In concluding that the subject landing area did not meet that definition, the court relied upon comparisons to landing areas outside of the relevant zoning district and relevant town. See Id. at 6–8 (noting that the comparable landing areas were in other municipalities). The decision also points out that Maul's Roost, located in Lincoln, is a separate geographical area from the at-issue landing strip. Id. at n. 3. In Brady Sullivan, the Court noted in dicta that the proposed landing pad in a residential planned unit development "could possibly be regarded as an accessory use." In re Brady Sullivan SV, LLC, No. 144-10-13 Vtec, slip op. at 8 (Vt. Super. Ct. Envtl. Div. Sept. 26, 2014) (Durkin, J.). In that decision, the Court cited to In re Sheiber, in which the Vermont Supreme Court noted that "accessory uses have traditionally involved such various activities as . . . airplane hangers." In re Scheiber, 168 Vt.534, 537 (1998) (citations omitted). Brady Sullivan was subsequently settled by stipulation of the parties, with the relevant municipality agreeing that the use was accessory, but the Court did not analyze the issue in full. Thus, prior case law does not conclusively resolve this issue. We therefore turn to the facts presented.

There are two private landing areas in the Town: the Rothblatt helipad and Maule's Roost. First, the Rothblatt helipad has been permitted as an accessory use and is located within the Outlying District. Neighbors and Ms. Ganahl argue that the Court should not consider either landing area.

With respect to the Rothblatt helipad, first, they argue that the helipad received an after-the-fact zoning permit. Second, they argue that the Rothblatt property, while within the same zoning district, is geographically located a distance away from the Property.[9] Neither presents grounds for the Court to decline to consider its existence. No party disputes that the Rothblatt helipad exists within the Town or its permitting status as an accessory use. Further, case law cited by Ms. Ganahl supports looking at landing areas not just within the Town, but within the same geographical region, when considering whether a use is an accessory use, generally. The Rothblatt helipad is not just within

---

[9] Ms. Ganahl also argues that the Rothblatt helipad is used less than the PLA is proposed to be used by the Clarks. The frequency of the Rothblatt helipad's use is not relevant to the Court's analysis of whether personal landing areas could be customarily incidental to a residential use.

the same geographical region, but it is within the same town and zoning district as the proposed use. Therefore, we will consider it.

With respect to Maule's Roost, Neighbors and Ms. Ganahl argue that the landing area has not been operational for an extended period of time such that it is irrelevant. This argument overlooks the fact that Maule's Roost was permitted by the Town and remains on federal maps as a landing area. The Court will therefore consider it.

Thus, there are two PLAs within the Town on residential lots.[10] There are 4 additional PLAs in Addison County. While not the most common of uses, the fact that there are two PLAs that have been permitted by the Town on residential properties is strong evidence that the As-Is PLA is "customarily incidental" to the primary residential use of the Property in the Town. We therefore conclude that the As-Is PLA meets the definition of an accessory use.

An accessory use must meet applicable dimensional standards and those set forth in the Viewshed Overlay District. See LZR §§ 505, 506. The As-Is PLA is in the same location as the Graded PLA and will simply not involve the grading required for the Graded PLA. Thus, for the same reasons as set forth above with respect to the Graded PLA, we conclude that the As-Is PLA complies with the applicable dimensional standards. Similarly, the As-Is PLA is functionally the same as the Graded PLA, and aesthetically is the same grassed strip, without grading. The As-Is PLA proposes no structures, lighting, and the same limited clearing. Thus, for the same reasons as set forth above with respect to the Graded PLA, we conclude that the As-Is PLA complies with the Viewshed Overlay District standards.

Thus, we conclude that the As-Is PLA may be permitted as an accessory use.

### Conclusion

For the foregoing reasons, we conclude that the Graded PLA meets relevant conditional use standards as conditioned to a maximum of 2 take offs and 2 landings per day. With this condition, and without consideration of preempted topics, the Graded PLA will not have an undue adverse effect on the character of the area as it relates to visual impacts from take offs and landings.

Additionally, we conclude that the As-Is PLA meets the definition of an accessory use and satisfies the relevant standards such that it may be permitted as an accessory use. The As-Is PLA does not require the daily take off and landing condition.

---

[10] Evidence presented shows that there are four other PLAs in Addison County. The Court does not know whether these PLAs are on residential lots. The Court largely relies on the two PLAs on residential properties within the Town, as they are most analogous to the present application and simply notes that there are other PLAs within the relevant county.

This concludes the matter before the Court.  A Judgment Order accompanies this Decision.

Electronically signed this 28th day of May 2025 pursuant to V.R.E.F. 9(D).

Thomas G. Walsh, Judge
Superior Court, Environmental Division