VERMONT SUPERIOR COURT
Environmental Division
32 Cherry St, 2nd Floor, Suite 303,
Burlington, VT  05401
802-951-1740
www.vermontjudiciary.org



Docket No. 25-ENV-00058

| | |
|---|---|
| Land Use Review Board,<br>            Plaintiff,<br><br>        v.<br><br>3643 VT Route 103, N, LLC, et al,<br>            Respondent. | **MERITS DECISION** |

## Introduction

This matter involves a disputed Administrative Order (AO) issued by the Vermont Land Use Review Board (LURB) against multiple Respondents, who are the collective owners and operators of three quarries located on separate parcels of land in the Town of Chester, Vermont.[1]  The LURB filed the AO with this Court on July 23, 2025, and Respondents filed a request for hearing on that same day.  The Court conducted a one-day merits hearing on September 5, 2025, in which both the LURB and Julian participated.[2]

## Findings of Fact

1.   This matter involves a disputed Administrative Order (AO), filed July 23, 2025, issued by the Vermont Land Use Review Board (LURB) against Respondents, who are the owners and operators of three quarries in the Town of Chester, Vermont.

2.   Respondents timely requested a hearing in connection with the AO.  The Court held a merits hearing on September 5, 2025.[3]

---

[1]  Respondents include: 3643 VT Route 103 N, LLC; 137 Chandler Road, LLC; 137 Chandler Road VT, LLC; Julian Materials, LLC; Julian Development, LLC; M Julian, LLC; Jason Julian; Andrew Julian; Maureen Julian; and Michele Julian.  At trial, the parties agreed to collectively refer to the Respondents as "Julian" unless more specific identification is required.

[2]  Representatives of the Town of Chester and certain neighbors, and their counsel, also observed the merits hearing.

[3]  The parties requested an opportunity to submit post-hearing legal memoranda, which were filed on September 12, 2025.

3. The three quarries are known, respectively, as the North Quarry, the South Quarry (also known as the Allstone Quarry) and the Chandler Quarry.

4. The North Quarry is located at VT Route 103 North, on a parcel of land +/- 343 acres in size.

5. The South Quarry is located on the same parcel as the North Quarry, approximately 2,900 feet south of the North Quarry.

6. The Chandler Quarry is located on a separate, 8.5-acre parcel located at 137 Chandler Road, Chester, Vermont, approximately 1.5 miles from the North and South Quarries.[4]

7. Julian has been hauling stone from the Chandler Quarry since at least 2009.

8. In 2011, Julian entered into a lease agreement with the former owner of the Chandler Quarry to begin both hauling and harvesting stone at the Chandler Quarry. At that time, the Chandler Quarry was operating fully as a pre-existing quarry, separate and independent from the North Quarry and South Quarry, and that fell below Act 250's 10-acre jurisdictional threshold for towns, like Chester, with permanent zoning and subdivision regulations.

9. In March 2018, Julian acquired the North Quarry and the South Quarry.

10. At the time of acquisition, both the North Quarry and the South Quarry were operating. There were no sound barriers or berms present at the South Quarry.

11. At the time of their acquisition by Julian, and thereafter, the North Quarry and South Quarry were subject to Land Use Permits #2S0755 and #2S0775-1 (Altered), issued by the Act 250 District #2 Environmental Commission in July 1988 and June 2005, respectively, as well as the findings, conditions and exhibits associated with those permits.

12. In February 2019, Julian acquired the Chandler Quarry.

13. Beginning in 2018, Julian substantially increased activity at these three quarries. It purchased new equipment, hired as many as 42 employees, began fabricating/processing stone "in house" at the Chandler Quarry and sold finished goods on site (presumably from the Stone Store).

14. Beginning in 2018, and continuing to present, the Natural Resources Board (the predecessor to the LURB) received complaints from neighboring landowners regarding activities conducted by Julian at the quarries.

15. In 2021, Julian constructed a new building on the Chandler Quarry property, permitted by the Town of Chester (Town) (Permit #21-065), which Julian used, in part, to store equipment (including

---

[4] A third parcel of land, owned by Green Mountain Railroad, is located on the west side of VT Route 103. That parcel hosts the so-called Stone Store, an historic structure which Julian has also utilized for business purposes. This parcel is not at issue in this AO.

stone splitters and saws) and process/fabricate stone from all three quarries. Respondents' Exhibit A; Testimony of J. Patrick.

16. While use of the building (at least for coordinated rock splitting/fabricating activities) stopped in April 2024, the building is still present on the property. Id.

17. Construction of the building at the Chandler Quarry in 2021, which housed splitters, saws and similar equipment and that was used to fabricate stone on site, was a "big physical change" to the property and the use thereof. Testimony of J. Patrick.

18. On March 6, 2023, the State Coordinator issued Jurisdictional Opinion (JO) 2-324, concluding that Julian's quarrying activities at the three quarries required an Act 250 permit amendment to Land Use Permit Series #2S0755. The State Coordinator denied Julian's request for reconsideration of the JO on April 20, 2023.

19. Following a timely appeal of the JO, this Court granted summary judgment in favor of the Natural Resources Board, concluding that: (1) Julian's use of a hydraulic hammer in connection with its quarrying activities at the South Quarry required a permit amendment; (2) the previously issued Act 250 permits for the North and South Quarries required operations at the North Quarry to cease, and the North Quarry to be reclaimed, by 2008; (3) the 2008 expiration date for Land Use Permit #2S0775 was not extended to October 1, 2025; (4) future reclamation plans or activities at the North Quarry, including the removal of stone for reclamation purposes and the extension of deadlines to reclaim the North Quarry, required a permit amendment; (5) Julian's operations at the Chandler Quarry, which Julian had begun coordinating with operations at the North and South Quarry, constituted a substantial change to a pre-existing development that necessitated an Act 250 permit amendment. Julian Materials, LLC JO Appeal, No. 23-ENV-00043, slip op. at 6-11 (Vt. Super. Ct. Envtl. Div. March 13, 2024) (Durkin, J.) (Decision on Motions); LURB Exhibits 24 and 25.

20. This Court's Decision on Motions, and an accompanying Judgment Order, in Docket No. 23-ENV-00043 were not appealed.

21. On April 1, 2024, Julian entered into a Stipulation with the Town and other interested parties to resolve a zoning appeal to the Chester Development Review Board involving a Notice of Violation issued by the Town. Respondents' Exhibit A.

22. The AO alleges that Julian has violated Land Use Permit Series 2S0775, JO 2-324, this Court's Decision on Motions and Judgment Order in Docket No. 23-ENV-00043, and various findings, conditions and exhibits associated with Land Use Permit Series 2S0775 by: (1) continuing to operate the North Quarry; (2) continuing to use a hydraulic hammer at all three quarries; (3) failing to

implement reclamation plans at the North and South Quarries; (4) failing to install and maintain a sound berm at the South Quarry; (5) continuing to operate the Chandler Road Quarry without a permit or permit amendment; and (6) not applying for permit amendments for Land Use Permit Series 2S0775. These violations are alleged to have occurred between 2018 and 2025 and, in certain instances, are continuing.

23. As a remedy for the alleged violations, the LURB seeks compliance with the Permit Series 2S0775, the JO, this Court's decision (and Judgement Order) in Docket No. 23-ENV-00043, monetary penalties and related costs totaling $29,965.00, a stop work order at all three quarries and an order that Julian file a complete application for Act 250 permit amendments by July 31, 2025, and that it "diligently pursue" the same.

24. There are presently three employees working at the South and Chandler quarries, including Mr. Patrick, who is on site in Chester 2 to 3 days per week. Each quarry is worked 2 to 3 times per week on a rotating schedule.

25. Julian has not reclaimed the North Quarry or the South Quarry (which was to be reclaimed in stages), has not constructed the sound berm and has not yet applied for Act 250 permit amendments.

26. Julian's engineers are presently working on Act 250 amendment applications for the North Quarry and South Quarry only. The precise status of those amendment applications is not known and no amendment applications for the quarries had been filed as of the date of this Court's merits hearing.

27. In January/February 2024, Julian ceased all quarrying activity at, and removed equipment from, the North Quarry.

28. In accordance with the Court's Decision and the Stipulation, Julian also ceased all use of the hydraulic hammers in Chester by early 2024.[5]

29. Similarly, on or about April 1, 2024 (the date of the Stipulation), Julian took steps to "decouple" the Chandler Quarry from the North and South Quarries. It stopped transporting stone from the North and South Quarry to the Chandler Quarry for processing and fabrication. No fabricating whatsoever occurs at the Chandler Quarry at this time.

---

[5] Prior to March/April 2024, Julian was fully operating the Chandler Quarry seven days per week, including using hydraulic hammers 3-5 days per week. Julian sold the two hydraulic hammers that it owned on March 1, 2024. Respondents' Exhibit B. Further, under the Stipulation, Julian agreed to discontinue the use of "rock-hammers" at the three Chester quarries until such time as it had received all local, state and federal permits authorizing their use. Respondents' Exhibit A.

30. Julian continues to work both the South and Chandler Quarries, although the scope and intensity of its operations are substantially curtailed from prior years.[6] Presently, Julian has only three employees working its Chester quarries, including Jonathan Patrick, Julian's manager.

31. Presently, raw stone from the South and Chandler Quarries is drilled, blasted and trucked off-site (more than five miles from the Chester quarries) for processing by one or more third party contractors or subcontractors.[7] Julian contracts with third parties to fabricate the stone off site so that no guillotining, hammering or palletizing of stone occurs in Chester. Julian sold some of its equipment to these third parties to facilitate their work.

32. Third-party contractors are also engaged in de-watering activities at the Chandler Quarry. Some of the water is trucked to Rockingham for use in stone processing there.

33. The Land Use Permit for the South Quarry, #2S0775-1 (Altered), expires on October 1, 2025. After that date, Julian plans to cease operations at that South Quarry, dismantle its equipment located there and haul it off site for use at Julian's other quarries until a new Act 250 permit or permit amendment is in place.

34. Julian's long-term plan is to continue to work South Quarry "for many years" after its Act 250 permit or permit amendment is approved.

35. Julian has stipulated to the LURB's requested monetary penalty and has had discussions with the LURB regarding a payment schedule.

36. Julian opposes the requested stop work order, which it contends will have a substantial negative economic effect on individuals other than Respondents, including through employee lay-offs, the termination of business activity and unfulfilled contracts.

## Legal Standards

The legal standards applicable to the Court's review of a contested administrative order are largely statutory. Under 10 V.S.A. § 8008(a), "when the [Land Use Review] Board determines that a violation of chapter 151 of this title exists, the Board may issue an administrative order with respect to the violation." 10 V.S.A. § 8008(a). An administrative order must contain certain statutorily required elements and may include a "'stop work' order that directs the respondent to stop work until a permit is issued, compliance is achieved, a hazard is abated, or any combination of the above."[8] Id.

---

[6] Julian also owns and operates a quarry in New Hampshire.

[7] Stone processing now occurs in Rockingham, Vermont and Newtown, Connecticut.

[8] As defined in Chapter 201 of Title 10, a "stop work order" means "an order to cease construction or other activity." 10 V.S.A. § 8002(8).

at § 8008(b), (c)(1). In addition, an administrative order may include a proposed monetary penalty. Id. at § 8008(c)(3). In determining the amount of an administrative penalty, the Secretary, and this Court on appeal, must consider certain statutory factors, as well as the maximum amount that may be assessed for each determination of a separate violation. Id. at § 8010(b), (c)(1). As the agency issuing the administrative order, the LURB has the burden of proving that the violation has occurred by a preponderance of the evidence. 10 V.S.A. § 8013(a). Where a hearing is requested, the Court has authority, pursuant to 10 V.S.A. § 8012, to determine whether a violation has occurred and to affirm, modify or reverse any provision of any administrative order issued, including deciding whether to affirm or reverse a stop work order. Id. at § 8012(b). When considering a stop work order, the Court must consider the economic effect of the order on individuals other than the respondent. Id. at § 8012(b)(3).

## Discussion

In our Decision on Motions in Docket No. 23-ENV-00043, referenced above, this Court concluded that a permit amendment to Land Use Permit Series #2S0775 was required for Julian's operations at North, South, and Chandler Quarries. Julian Materials, No. 23-ENV-00043, slip op. at 6-11 (Mar. 13, 2024) (Durkin, J.). Specifically, this Court found, in summary, that: 1) Julian's operation of a hydraulic hammer at South Quarry required a permit amendment; (2) the North Quarry should have ceased operations and been reclaimed in 2008 to coincide with development of the South Quarry, such that continued quarrying operations at the North Quarry after 2008, and any future reclamation of the North Quarry, was a material change requiring a permit amendment; (3) any extension of deadlines for the reclamation of the North Quarry, and any modification of those provisions, required Julian to first seek a permit amendment; and (4) Julian's operations at the Chandler Quarry, in conjunction with North and South Quarries, constituted a substantial change to a pre-existing development, thereby necessitating an Act 250 permit application/amendment and approval. Id. No party appealed that decision, and its findings and conclusions are now final. 24 V.S.A. § 4472.

In this case, the LURB argues that Julian has violated Land Use Permit Series 2S0775, JO 2-324, this Court's Decision on Motions and Judgment Order in Docket No. 23-ENV-00043, and various findings, conditions and exhibits associated with Land Use Permit Series 2S0775 by: (1) continuing to operate the North Quarry; (2) continuing to use a hydraulic hammer at all three quarries; (3) failing to implement reclamation plans at the North and South Quarries; (4) failing to install and maintain a sound berm at the South Quarry; (5) continuing to operate the Chandler Road Quarry

without a permit or permit amendment; and (6) not applying for permit amendments for Land Use Permit Series 2S0775.

Based on this Court's prior ruling in Docket No. 23-ENV-00043 and the foregoing findings, and conclusions of law below, this Court concludes that:

(1) By operating the North Quarry, from its acquisition by Julian in 2018 until January/February 2024, without first applying for and obtaining a permit amendment, Julian violated Land Use Permits 2S0775 and 2S0775-1 (Altered), and JO 2-324. The evidence demonstrates, however, that quarrying operations at the North Quarry, which was scheduled to close in 2008, ceased in January/February 2024 and, therefore, Julian did not violate this Court's Decision on Motions and Judgment Order in Docket No. 23-ENV-00043 and this violation is not continuing.

(2) By using a hydraulic hammer at the North and South Quarries, beginning in 2018, without first obtaining a permit amendment, Julian violated Land Use Permits 2S0775 and 2S0775-1 (Altered). Further, to the extent Julian used a hydraulic hammer at the Chandler Quarry between the time that it began co-mingling that quarry with the North and South Quarries and March 2024, without first applying for and obtaining an Act 250 permit or permit amendment, that use also constituted a violation.[9] However, Julian ceased all use of and sold the hydraulic hammers by March 1, 2024. Therefore, Julian did not violate this Court's Decision on Motions and Judgment Order in Docket No. 23-ENV-00043 and this violation is not continuing.

(3) By failing to take all required steps to implement the reclamation plans for the North Quarry and the South Quarry, including applying for permit amendments to extend deadlines in a timely manner, Julian violated Land Use Permits 2S0775 and 2S0775-1 (Altered), JO 2-324, and this Court's Decision on Motions and

---

[9] The Court understands that rock hammering was a lawful activity that occurred at the Chandler Quarry as part of its pre-existing operation. When Julian co-mingled operations at Chandler Quarry and the North and South Quarries, affecting a substantial change, it triggered Act 250 jurisdiction, such that the Chandler Quarry could no longer lawfully operate as a quarry without an Act 250 permit or permit amendment. Since rock hammering was a component of quarrying activity at the Chandler Quarry that occurred after Act 250 jurisdiction was triggered, and before a permit or permit amendment was obtained, it was an aspect of the violation that occurred there (i.e., quarrying, subject to Act 250 jurisdiction, without a permit). Rock hammering at the Chandler Quarry, in and of itself, did not constitute an independent violation separate from other (unpermitted) quarrying activity.

Judgment Order in Docket No. 23-ENV-00043. Julian admits that it has not reclaimed the North or South Quarries, nor has it applied for the necessary permit amendments to do so. Julian's representatives do not know precisely when those amendment applications will be filed. This is a continuing violation.

(4) By failing to install and maintain the required sound berm at the South Quarry, without first applying for and obtaining an Act 250 permit or permit amendment, Julian violated Land Use Permit 2S0775-1 (Altered). Julian admits this violation, which is continuing.

(5) By operating the Chandler Quarry in conjunction with the North and South Quarries, without first applying for and obtaining an Act 250 permit or permit amendment, Julian violated JO 2-324 and this Court's Decision on Motions and Judgment Order in Docket No. 23-ENV-00043. As further discussed below, this is a continuing violation.

(6) By not timely applying for and obtaining required permit amendments for its unauthorized activities between 2018 and 2025, as described herein and in 23-ENV-00043, Julian violated JO 2-324. Julian admits that it has not yet applied for Act 250 permit amendments. This is a continuing violation.

Julian, for its part, largely admits the violations, identified above, that occurred prior to this Court's March 13, 2024 Decision on Motions, as well as certain violations continuing subsequent to that Decision. Further, Julian has stipulated to the administrative penalty of $29,965 requested by the LURB. Considering the factors listed in 10 V.S.A. § 8010(b), and given the history recited above, this penalty amount (which does not exceed statutory maximum limits) is reasonable and, therefore, the Court adopts it.[10]

Given the Court's previous decision in the JO appeal, which concluded that there was a substantial change to a pre-existing development at the Chandler Quarry, bringing it within the jurisdiction of Act 250, the primary question before this Court is whether Chandler Quarry remains subject to Act 250 jurisdiction following Julian's efforts to cease all activities in coordination with the North and South Quarries.

---

[10] This penalty amount is comprised of $27,500 for the violations noted in the AO, $2,450 for the LURB's costs in enforcing this action, and a $15 recording fee to file the AO in the Town of Chester Land Records.

Act 250 requires a landowner to obtain a permit for a pre-existing development when there has been a substantial change to that development. Act 250 Rules, Rule 34(B); 10 V.S.A. § 6081(b); In re Request for Jurisdictional Opinion re Changes in Physical Structures & Use at Burlington Int'l Airport for F-35A, 2015 VT 41, ¶ 7. "Substantial change" is "any change in a pre-existing development or subdivision which may result in significant impact with respect to any of the criteria specified in 10 V.S.A. § 6086(a)(1) through (a)(10)."[11] Act 250 Rules, Rule 2(C)(7). Thus, because a development is exempt at one time does not mean it will always be exempt. In re Orzel, 145 Vt. 355, 361 (1985). In the case of Chandler Quarry, we previously determined that Julian's coordinated operations there (i.e., operating Chandler in conjunction with North and South Quarries) constituted a substantial change to a pre-existing development, necessitating an Act 250 permit application and approval.

Although Vermont courts adhere to the substantial change analysis described above, the Vermont Supreme Court carved out certain jurisdictional exceptions with its holdings in In re Audet, 2004 VT 30, and In re Huntley, 2004 VT 115. Audet involved a landowner (Audet) who purchased an unpermitted tract of land near two contiguous tracts of land that comprised his auto repair and sale business. Audet, 2004 VT at ¶ 2. Following purchase, Audet cleared the parcel and began using it to store "junked cars, a large pile of used tires, automotive debris, a company truck and a flatbed trailer." Id. at ¶ 3. After the Environmental Board decided Audet did not need an Act 250 permit for the parcel, that decision was appealed to Vermont Supreme Court. Id. at ¶ 5. The Vermont Supreme Court found that when Audet began using the tract as part of his business, Act 250 jurisdiction attached to the land and thus required a permit. Id. at ¶ 14. It also found, however, that it was possible for Act 250 jurisdiction over a property to dissolve, provided that the use of the property that triggered Act 250 jurisdiction ceased and the landowner's decision to clear the property of items associated with his business was "made in good faith and occurred without any sort of construction, physical change to the land or other ongoing impact that would require Act 250 review." Id. Therefore, when Audet ceased using his property for business purposes and cleared the land of items associated with his business, Act 250 jurisdiction dissolved.

By contrast, Huntley involved a couple, the Huntleys, who purchased land that was subject to an existing Act 250 permit and who subsequently applied for an Act 250 permit amendment

---

[11] As discussed in Docket No. 23-ENV-00043, the Vermont Supreme Court has affirmed a two-part inquiry to resolve whether an action constitutes a "substantial change." The two-part inquiry involves a determination as to "whether there has been a cognizable physical change to the preexisting development, and if so, whether the change has the potential for significant impact under one or more of the ten Act 250 criteria." Id.; see also Sec'y, Vt. Agency of Nat. Res. v. Earth Constr., Inc., 165 Vt. 160, 164 (1996); In re H.A. Manosh Corp., 147 Vt. 367, 369-70 (1986).

authorizing minor changes in a mining operation and extending the completion date for all mining and reclamation activities. Huntley, 2004 VT at ¶ 2–3. Importantly, the Huntleys had ceased all mining operations and completed reclamation of the land subject to the permit by the applicable deadline in the permit. Id. The Environmental Board determined that the Huntley's mine and associated property remained subject to Act 250 jurisdiction even though the site had been fully reclaimed, and its former permit had expired. Id. at ¶ 1. On appeal, the Vermont Supreme Court reversed the Environmental Board's determination that Act 250 jurisdiction continued to exist over the property, finding that the Board "erroneously interpreted our case law to mean that, once Act 250 is triggered, subsequent events, including the permit's expiration and the completion of reclamation, do not dissolve jurisdiction." Id. at ¶ 12.

In this case, Julian argues that under Audet, the changes to Chandler Quarry did not result in "material physical impacts" to the land that would support continuing Act 250 jurisdiction. 2004 VT at ¶ 14. Further, Julian argues that it has "ceased all operational connections" between Chandler and the North and South Quarries such that Act 250 jurisdiction no longer exists over Chandler, and they should be allowed to resume operations without a permit. Id. The LURB responds that once established, Act 250 jurisdiction over Chandler cannot dissolve until it is properly permitted. In the alternative, they argue that Chandler Quarry is still involved with the North and South Quarries because water from Chandler is used in processing stone from South Quarry at a third location that is not involved land. Id. at 8–9.

The Chandler Quarry remains subject to Act 250 jurisdiction. Huntley does not stand for the proposition that the bell of Act 250 jurisdiction "cannot be unrung after the fact," in any circumstance, until the proper permits have been obtained. LURB Findings of Fact, p. 7; 2004 VT at ¶ 13. Under Audet, Act 250 jurisdiction over Chandler Quarry could dissolve if Julian's changes in their use of Chandler Quarry "were made in good faith and occurred without any sort of *construction, physical change to the land*, or other ongoing impact that would require Act 250 review." 2004 VT at ¶ 14 (emphasis added).[12]

---

[12] Further, in distinguishing Huntley from Audet, the Court specifically notes that Huntley applies to cases where a landowner had obtained an Act 250 permit that had expired, whereas Audet applies to situations where a landowner has not yet obtained a permit, but commences activities on their land sufficient to potentially trigger jurisdiction. Huntley, 2004 VT 115, ¶ 13. Because Julian never obtained a permit for Chandler Quarry, this case falls into the latter category.

Notably, the facts of Huntley are distinguishable from the situation at the North Quarry. Julian acquired the North Quarry after the permit expired. In Huntley, the landowners "had ceased mining operations, and fully reclaimed and rehabilitated the property in accordance with the permit requirements" prior to the extended permit deadline. Id. at ¶ 3. Both expiration and the completion of reclamation were factors dissolving jurisdiction. Id. at ¶ 12. Only one such

Julian has failed to show that the changes and operations at the Chandler Quarry are akin to those in Audet. The evidence presented at trial demonstrates that the 2021 construction of a building at Chandler used to house saws, stone splitters and other equipment was, by Julian's own admission, a "big physical change" to the property. Hearing Recording, September 5, 2025. Further, although the use of the building had ceased, it remains on the property. Id. The presence of the building constitutes a physical change to the land sufficient to prevent the dissolution of Act 250 jurisdiction under Audet. 2004 VT at ¶ 14. In the context of Audet, it would be as though the landowner built a structure to house the junked cars, tires, debris, and vehicles that initially triggered Act 250, then removed those items but left the building standing. This clearly constitutes an "improvement[] on the land for business purposes, [that will leave] a lasting impression on the landscape . . . ." Id. at ¶ 16. As such, Chandler Quarry remains subject to Act 250 jurisdiction and Julian's failure to apply for and obtain a permit for its operations at Chandler constitutes a continuing violation.

Under 10 V.S.A. § 8008, a judicial order issued pursuant to an administrative decision of the LURB may include a "stop work" order that "directs the respondent to stop work until a permit is issued . . . ." 10 V.S.A. § 8008(c)(1). Given the continuing violations identified herein, the Court affirms the LURB's "stop work" order until Julian has obtained the appropriate Act 250 permit/permit amendments. The Court does not take this step lightly but feels compelled to do so, considering the clear and unambiguous language of the applicable regulatory documents, referenced above, the long duration of the continuing violations, the direction provided to Julian by the JO and Decision on Motions, the relatively small number of employees (3) presently working at the Chester quarries (and the reduced activity there), and the potential for Julian to mitigate economic harm to its employees by diligently pursuing necessary Act 250 permits/permit amendments.

Julian, the LURB, and the Attorney General have a right to appeal this decision to the Vermont Supreme Court in accordance with the Vermont Rules of Appellate Procedure. The decision shall become final if no appeal is requested within 10 days of the date the decision is received. 10 V.S.A. § 8012(c)(4)-(5).

Electronically signed on September 30, 2025, pursuant to V.R.E.F. 9(d).

---

factors is present at the North Quarry: expiration. No reclamation work has occurred at the quarry and the work that remains has significant potential for impacts under the Act 250 criteria.

Joseph S. McLean
Superior Court Judge
Environmental Division